No. 99,704

STATE OF KANSAS, *Appellee*, v. BRYAN DOUGLAS SPRUNG, *Appellant*.

(277 P.3d 1100)

Opinion filed May 4, 2012.

*Lydia Krebs*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Robert A. Walsh*, county attorney, argued the cause, and *Steve Six*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

MORITZ, J.: We granted Bryan Sprung's petition for review of the Court of Appeals' decision affirming his jury convictions of one count of aggravated criminal sodomy, two counts of aggravated indecent liberties with a child, and one count of criminal threat. Sprung seeks reversal of one of his aggravated indecent liberties convictions, arguing the convictions are multiplicitous. Further, Sprung claims the prosecutor committed misconduct during closing argument by commenting on the credibility of the victim as well as an expert witness and investigator hired by Sprung. Sprung also contends the district court abused its discretion in denying his motion to compel a psychological examination of the victim. Finally, Sprung argues the district court violated his constitutional rights by imposing an aggravated presumptive sentence for his conviction of aggravated criminal sodomy without a jury determination of the aggravating factors.

We affirm the Court of Appeals' decision in part, and we reverse in part. We conclude Sprung's aggravated indecent liberties convictions are multiplicitous because (1) the charges arose from the

same act or transaction; and (2) the plain language of the charging statute, K.S.A. 21-3504(a)(3)(A), provides only one unit of prosecution rather than two. Accordingly, we reverse the Court of Appeals' decision affirming both convictions, we reverse one conviction, and we vacate Sprung's sentence, in part. Regarding Sprung's claim of prosecutorial misconduct, we agree with the Court of Appeals' conclusion that the State has demonstrated beyond a reasonable doubt that the prosecutor's statements regarding the credibility of the victim, Sprung's expert witness, and Sprung's investigator—even if improper—did not affect the outcome of the trial in light of the entire record. We also find that the district court did not abuse its discretion in denying Sprung's motion to compel a psychological examination of the victim. Finally, we affirm the Court of Appeals' dismissal of Sprung's sentencing claim for lack of jurisdiction.

## Factual and Procedural Background

Sprung's convictions arose from offenses he committed against K.M., a 10-year-old girl. In early 2006, K.M. attended a weekly youth group, "Friends Club," at the church where Sprung was pastor, and she occasionally attended Sunday services at the church. Sprung sometimes gave K.M. rides to and from church. If no one answered the front door at K.M.'s home on Sunday mornings when he came to pick her up, Sprung sometimes knocked on K.M.'s bedroom window. Once or twice, Sprung asked for a key to the house so he would not wake the rest of the family on Sunday mornings.

In April 2006, K.M. disclosed to her mother several incidents of abuse that she said had occurred in the previous several weeks in Sprung's office after Friends Club. During the first incident, Sprung motioned for K.M. to sit on his lap and rubbed K.M.'s crotch area on the outside of her clothing. A few weeks later, while K.M. was waiting for a ride home, Sprung told K.M. to sit on his lap. Sprung pulled down K.M.'s pants and his own pants and he digitally penetrated K.M.'s vagina, causing pain to K.M. Several weeks later as K.M. waited for a ride home from Friends Club, Sprung called her into his office. Sprung shut the door, sat down,

and motioned for K.M. to sit on his lap. After K.M. did so, Sprung pulled down her pants, then pulled down his own pants, and digitally penetrated K.M.'s vagina and anus.

Several weeks later, as K.M. waited for a ride home, Sprung again called her into his office and shut the door. Sprung motioned for K.M. to sit on his lap and after she did so, he pulled down K.M.'s pants and then pulled down his own pants. Sprung digitally penetrated K.M.'s vagina and anus. He then pushed K.M. off his lap, placed her hand on his erect penis, and moved her hand up and down. Sprung also asked K.M. to put his penis in her mouth but K.M. refused.

After this last incident, K.M. reported the abuse to her mother. K.M. decided to report the abuse because she was afraid that Sprung would "go all the way," which K.M. explained meant Sprung would "[p]ut his body part inside of [hers]."

Fran Garrison, the former director of Friends Club, offered testimony corroborating K.M.'s testimony. Garrison testified that one evening after Friends Club in January 2006, she found the door to Sprung's office closed. Garrison knocked on the door but did not wait for an answer before walking into Sprung's office. There, she observed Sprung sitting at a chair at his desk with K.M. on his lap. According to Garrison, Sprung sat "straight as a board, leaning back with his head back and legs straight out forward," while K.M. sat on Sprung's lap facing away from Sprung. Garrison told K.M. to get off Sprung's lap and asked Sprung what he was doing, to which he responded, " 'Giving hugs.' " Garrison noticed Sprung using his hands to adjust himself in his genital area, where Garrison could see a bulge about the size of her fist.

Garrison further testified that as she locked up the church one evening after Friends Club in February 2006, she again found K.M. and Sprung alone in Sprung's office. Just before she entered Sprung's office, Garrison heard the door being unlocked. K.M. was playing a game on Sprung's computer but was not sitting on his lap, and Sprung had his arm around K.M.'s chair. Garrison offered to give K.M. a ride home, but Sprung told Garrison he would take K.M. home.

Susan Reinert, a sexual assault nurse examiner, testified at trial that she examined K.M. after K.M. reported the abuse. During the exam, K.M. told Reinert that Sprung touched K.M.'s vaginal area on more than one occasion and that Sprung had forced K.M. to touch his penis. K.M. also reported to Reinert that she found blood on her panties and toilet paper after some of the incidents. Reinert found no signs of scarring or injuries in K.M.'s vaginal or anal areas.

K.M.'s mother (Mother) testified that in January 2006, as K.M. used the bathroom, she told Mother she had started her period. Mother saw light blood on the toilet paper used by K.M., but did not believe K.M. had started her period. Mother asked K.M. if someone had touched her and K.M. said no. A few days later, as Mother did laundry, she found light blood in K.M.'s panties.

Mother also testified that Friends Club usually ended at about 8 p.m. and, on some occasions, Sprung did not bring K.M. home until 10 p.m.

Sprung testified at trial that he never inappropriately touched K.M. He maintained that he had a "close relationship" with K.M.'s family and that he gave K.M. several rides to Friends Club in the first few months of 2006. However, Sprung recalled taking K.M. home after Friends Club only once during that time period.

Sprung admitted that he sometimes knocked on K.M.'s bedroom window to get her attention when he picked her up at her home for Sunday services and that this practice was unique to K.M.'s family. Sprung also admitted that he asked for, but never received, a key to K.M.'s home. Sprung explained that he asked for a key because K.M.'s parents, who had requested he pick up their children for Sunday services, complained that his knocking woke them up on Sunday mornings.

Sprung recalled Garrison walking into his office in January 2006 as K.M. sat on his lap. But according to Sprung, he was not acting inappropriately towards K.M; instead he was just "giving [K.M.] a hug goodbye." Sprung testified that Garrison told him it was inappropriate for him to have children on his lap, but Sprung responded that by welcoming children to sit on his lap, he was simply following Jesus' example.

The jury convicted Sprung as charged of one count of aggravated criminal sodomy, two counts of aggravated indecent liberties with a child, and one count of criminal threat. The sentencing court imposed a controlling prison sentence of 241 months with 36 months' postrelease supervision.

On direct appeal, a panel of the Court of Appeals affirmed Sprung's convictions and dismissed his sentencing challenge for lack of jurisdiction. *State v. Sprung*, No. 99,704, 2009 WL 1591397 (Kan. App. 2009) (unpublished opinion). We granted Sprung's petition for review.

## ANALYSIS

*Sprung's aggravated indecent liberties convictions are multiplicitous.*

In the Court of Appeals, Sprung sought reversal of one of his two convictions for aggravated indecent liberties with a child, claiming the convictions were multiplicitous. He argued the charges arose from the same conduct and, by statutory definition, his conduct constituted only one violation of K.S.A. 21-3504(a)(3)(A). Sprung also raised a jury unanimity issue. The Court of Appeals panel rejected both the multiplicity and jury unanimity arguments.

On review, Sprung renews his multiplicity argument but does not seek review of the panel's unanimity ruling; therefore, we will not address that issue on review.

Multiplicity is the charging of a single offense in several counts of a complaint or information. Multiplicity creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. *State v. Schoonover*, 281 Kan. 453, 475, 133 P.3d 48 (2006).

Whether convictions are multiplicitous is a question of law subject to de novo review. *State v. Sellers*, 292 Kan. 117, 127, 253 P.3d 20 (2011).

In resolving a multiplicity claim, we first determine whether the convictions arose from the same conduct. If so, we then determine whether, by statutory definition, that conduct constitutes one offense or two. *Schoonover*, 281 Kan. at 496. If the conduct consti-

tutes only one offense, then both components are met and there is a double jeopardy violation. 281 Kan. at 496.

### 1. *Sprung's convictions arose from the same conduct.*

The first component of the multiplicity inquiry requires us to determine whether the conduct is discrete or unitary. 281 Kan. at 496. If the conduct is discrete, the convictions do not arise from the same offense and there is no double jeopardy violation. But if the charges arose from the same act or transaction, then the conduct is considered unitary and we move to the second component of the inquiry. 281 Kan. at 496.

In determining whether Sprung's convictions arose from the same conduct, we consider several factors, including whether: (1) the acts occurred at or near the same time, (2) the acts occurred at the same location, (3) a causal relationship existed between the acts, in particular whether an intervening event separated the acts, and (4) a fresh impulse motivated some of the conduct. See 281 Kan. at 497. We note that these factors are the same factors we utilize in determining whether there are multiple acts requiring a jury unanimity instruction. 281 Kan. at 497.

The parties agree that the aggravated indecent liberties charges, Counts II and III, were based on the final incident described by K.M. The trial court specifically instructed the jury that Count II related to Sprung's touching of K.M. and Count III related to K.M.'s touching of Sprung's penis. The jury verdict form reflected that same distinction.

According to K.M.'s trial testimony regarding that incident, Sprung digitally penetrated her vagina and anus, pushed her off his lap, and placed her hand on his penis. All of these events occurred on the same night in Sprung's office and at or near the same time. Further, there is no evidence of an intervening event or suggestion that a fresh impulse motivated Sprung's act of placing K.M.'s hand on his penis. Instead, Sprung's acts of touching K.M. and then placing her hand on his penis were unitary rather than factually separate and distinct. Compare *Sellers*, 292 Kan. at 130-31 (concluding defendant's conduct was not unitary when defendant touched victim, left the room for 30 to 90 seconds to check on

a barking dog, returned to the room, and touched the victim a second time, with *State v. Colston*, 290 Kan. 952, 964, 235 P.3d 1234 (2010) (determining that defendant's digital penetration and penile penetration of the victim that occurred at or near the same time, in the same location, and with no suggestion of an intervening event were not "factually separate and distinct" acts).

Because we have concluded Sprung's two aggravated indecent liberties convictions arose from the same act or transaction, we now move to the second component of *Schoonover*'s multiplicity analysis.

2. *By statutory definition, Sprung's conduct comprised one violation of K.S.A. 21-3504(a)(3)(A).*

Under the second *Schoonover* component, we must determine whether, by statutory definition, Sprung's conduct constitutes one offense or two. See 281 Kan. at 497. Because Sprung's convictions are based on multiple violations of the same statute, the unit-of-prosecution test applies. See 281 Kan. at 497. This test requires that we interpret the statutory definition of the crime to determine the allowable unit of prosecution intended by the legislature. 281 Kan. at 497. Only one conviction can result from each allowable unit of prosecution. 281 Kan. at 497-98.

In *Schoonover*, 281 Kan. at 472, we pointed out that the determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Instead, the key is the scope of the course of conduct proscribed by the statute.

The statute at issue here, K.S.A. 21-3504(a), prohibits:

"(3) engaging in any of the following acts with a child who is under 14 years of age:

(A) Any lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both; or

(B) soliciting the child to engage in any lewd fondling or touching of the person of another with the intent to arouse or satisfy the sexual desires of the child, the offender or another."

In rejecting Sprung's multiplicity argument, the Court of Appeals reasoned that K.S.A. 21-3504(a)(3)(A) proscribes lewd acts

"with respect to the child or the offender, therefore *either* conduct constitutes a unit of prosecution." *Sprung*, 2009 WL 1591397, at *5. The panel further noted that the jury instructions and the verdict form clearly distinguished the units of prosecution for the jury by specifying that Count II related to Sprung's act of touching K.M. and Count III related to Sprung's act of submitting to K.M.'s touching of Sprung's penis. 2009 WL 1591397, at *5. The panel's reasoning mirrored that of another panel in *State v. Cramer*, No. 96,166, 2008 WL 4416022, at *4 (Kan. App. 2008) (unpublished opinion) (noting that several of the incidents underlying the charges for aggravated indecent liberties involved multiple touchings, but concluding that the language of K.S.A. 21-3504[a][3][A] "clearly states that either touching the child *or* the offender is enough to constitute an offense. The unit of prosecution, thus, is one such touching of either party.").

In arguing the panel's rationale is faulty, Sprung points out that the legislature in K.S.A. 21-3504(a)(3) chose to prohibit "engaging in any of the following acts." The statute then sets out two separate subsections in which those "acts" are defined. The first subsection, which is at issue here, defines the criminal "act" as "[a]ny lewd fondling or touching of the person of either the child or the offender." (Emphasis added.) K.S.A. 21-3504(a)(3)(A). The second subsection makes the criminal "act" the soliciting of the child to fondle or touch another person. K.S.A. 21-3504(a)(3)(B). That subsection is not at issue here.

Sprung argues that if the legislature intended for each separate instance of touching or fondling to constitute a violation of K.S.A. 21-3504(a)(3), it could have defined aggravated indecent liberties with a child as "any *act* of lewd fondling or touching." Instead, the legislature chose to define the criminal "act" as "*any* lewd fondling or touching," suggesting that any number of touchings or fondlings could constitute only one violation of K.S.A. 21-3504.

The State maintains that K.S.A. 21-3504(a)(3) "provides different ways in which the crime can occur" and maintains that Sprung committed two distinctive acts against K.M. which may be prosecuted in different counts. The State also notes that the jury instructions listed "very different and distinctive elements."

But in considering the unit of prosecution test, the key is the nature of the conduct proscribed, not the number of acts or the number of victims. *Schoonover*, 281 Kan. at 472. As Sprung persuasively argues, the nature of the conduct proscribed by K.S.A. 21-3504(a)(3) is engaging in "any of the following acts." Subsection (A) then defines one of those "acts" as "[a]ny lewd fondling or touching of the person of either the child or the offender, done or submitted to with the intent to arouse or to satisfy the sexual desires of either the child or the offender, or both." K.S.A. 21-3504(a)(3)(A).

We are persuaded by Sprung's argument that K.S.A. 21-3504(a)(3)(A) creates only a single unit of prosecution. Had the legislature intended to create one unit of prosecution when the offender touches the child and a separate unit of prosecution when the child touches the offender, the legislature could have separated subsection (A) into two subsections, *i.e.*, one subsection proscribing any lewd fondling or touching of a child by the offender and one subsection proscribing any lewd fondling or touching of the offender by the child. Instead, the legislature defined aggravated indecent liberties as "engaging in any of the following acts," and then provided only two defining subsections, (A) and (B). See *Schoonover*, 281 Kan. at 472; see also *State v. Thompson*, 287 Kan. 238, 246-47, 200 P.3d 22 (2009) (finding that had legislature intended to make possession of each substance listed in K.S.A. 65-7006[a] a separate offense, legislature could have explicitly stated as much in the statute).

Further, like the statute at issue in *Thompson*, K.S.A. 21-3504(a)(3)(A) possesses a unifying intent—"to arouse or to satisfy the sexual desires"—with the object of that intent being the child, the offender, or both. See 287 Kan. at 248-52 (discussing the unitary intent to manufacture methamphetamine specified in K.S.A. 65-7006[a]). The legislature's inclusion of a unitary intent in subsection (A) lends additional support to our conclusion that the legislature intended to create a single unit of prosecution for that subsection.

Moreover, even if we were to find the legislature's intent to be unclear as to the unit of prosecution defined by K.S.A. 21-

3504(a)(3)(A), the rule of lenity would mandate that we construe the statute in favor of the defendant. Under that rule, statutory silence and ambiguity regarding the unit of prosecution is construed in favor of the defendant. See *Thompson*, 287 Kan. at 248-49.

Here, the jury convicted Sprung of the unitary conduct of Sprung's lewd fondling or touching of K.M. and K.M.'s fondling or touching of Sprung. Further, the plain language of the applicable subsection of the charging statute for both counts, K.S.A. 21-3504(a)(3)(A), creates a single unit of prosecution. We conclude Sprung's convictions for aggravated indecent liberties with a child are multiplicitous, and we reverse the Court of Appeals' ruling finding otherwise. Accordingly, we affirm one of those convictions, reverse the second conviction, and vacate the sentence for the second conviction.

*The prosecutor's statements, if improper, did not affect the outcome of the trial in light of the entire record.*

Next, Sprung claims the prosecutor committed reversible misconduct when he commented in closing argument on the credibility of K.M. as well as an expert witness and an investigator hired by Sprung. Although the Court of Appeals panel found the prosecutor's comments improper, it affirmed Sprung's convictions because it concluded the comments were not so prejudicial as to deny the defendant a fair trial. *Sprung*, 2009 WL 1591397, at *7-8.

During closing argument, the prosecutor commented on K.M.'s credibility in the following context:

"You know, as you go by, it's like falling off a ladder. You fall off the ladder two or three years ago, you may not remember, as you think back on it, why I was on a ladder in the first place, or what I was wearing, what time of day it was, may not remember all that, but you're going to remember when you started to slip, and you're going to remember how you felt when you're falling, and you're going to remember that fall when you hit. Those things, you're not going to forget. That's etched in your memory. And what [K.M.] told you is etched in her memory. And she'll go on past today, but they—will she ever forget that? She will never forget that, so what she told you, *that is the most credible witness you're going to have.*" (Emphasis added.)

Immediately after this comment, the prosecutor discussed the testimony of Sprung's expert witness, Kathie Nichols, Ph.D., and a private investigator hired by Sprung, Daniel Jablonski. In arguing that "trials are searches for truth," the prosecutor commented that Nichols had an agenda and wasn't there to tell the truth but "to get [Sprung] off." The prosecutor also stated Nichols "came up with the purpose of getting paid, she's paid, and try to get [Sprung] off, and what does she say?"

Next, the prosecutor discussed Jablonski's interview of Sprung, essentially characterizing it as a sham. The prosecutor reminded the jury that Jablonski testified he generally recorded "important interviews," but failed to record his interview with Sprung. The prosecutor then commented that Jablonski was "following instructions from defense counsel" and that in doing so, his goal was "not to get to the truth, [but to] try to get [Sprung] off." The prosecutor also reminded jurors that Sprung hired Jablonski, and, "You could just about disregard anything [Jablonski] said."

Sprung argues the prosecutor improperly commented on the credibility of the witnesses when he commented: (1) K.M. was the "most credible witness"; (2) Nichols and Jablonski were paid to lie on Sprung's behalf; (3) the jury could "just about" disregard anything Jablonski said. The State argues the prosecutor's comments on K.M.'s credibility, when placed in context, were not improper. However, the State concedes the impropriety of the prosecutor's comments regarding the expert witness and investigator.

We apply a two-step analysis to allegations of prosecutorial misconduct involving improper comments to the jury. First, we decide whether the comments were outside the wide latitude allowed the prosecutor in discussing the evidence. If so, we must determine whether the improper comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. McCaslin*, 291 Kan. 697, 715, 245 P.3d 1030 (2011).

This second step requires consideration of three factors: (1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming na-

ture that the misconduct would likely have had little weight in the minds of the jurors. 291 Kan. at 715. The third factor of the second step of the prosecutorial misconduct test may not override the first two factors unless the State proves " 'beyond a reasonable doubt that the error complained of did not affect the outcome of the trial in light of the entire record.' " *State v. Naputi*, 293 Kan. 55, 58, 260 P.3d 86 (2011) (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

Given the State's concession as to the impropriety of the prosecutor's comments regarding Nichols' and Jablonski's credibility, we will assume without deciding that the prosecutor also improperly commented regarding K.M.'s credibility. But because we find the improper comments did not constitute plain error, Sprung's claim ultimately fails.

Sprung suggests the prosecutor's comments demonstrated ill will and bad faith and that the comments were crucial because witness credibility was the key issue in the case and the evidence against him was not overwhelming.

But the record simply lacks circumstances supporting Sprung's suggestion that the prosecutor's comments were so egregious as to demonstrate ill will or bad faith. Further, we note that the prosecutor recognized in closing argument that credibility was a key issue in the case and reminded the jury that it would make the final decision regarding credibility.

And the testimony against Sprung was substantial. Significantly, K.M.'s version of events remained largely consistent from her initial disclosures through trial. And while no physical evidence corroborated K.M.'s allegations of anal and vaginal penetration, K.M. and K.M.'s mother both testified that K.M. experienced some light bleeding in January 2006. K.M.'s mother also testified that Sprung often brought K.M. home several hours after Friends Club was over.

Moreover, other evidence strongly corroborated K.M.'s version of events. Specifically, Garrison testified that in January 2006 she walked in on Sprung and K.M. alone in Sprung's office, where K.M. was seated on Sprung's lap facing away from Sprung and Sprung was sitting "straight as a board, leaning back with his head

back and legs straight out forward." After Garrison ordered K.M. off Sprung's lap, Sprung stood up and adjusted his genital area, revealing a fist-sized bulge in his pants. Sprung avoided talking to Garrison and walked into the bathroom.

Although Sprung denied K.M.'s allegations, he admitted Garrison walked into his office and saw K.M. seated on his lap. But Sprung claimed Garrison merely observed him "giving hugs" to K.M. and that his practice of "welcoming" children to sit on his lap was consistent with Jesus' example. Further, Sprung conceded that he sometimes knocked on K.M.'s bedroom window when he came to pick her up, that he asked for a key to the house, and that this behavior was unique to K.M. and her family.

Under these circumstances, we are convinced that the State has demonstrated beyond a reasonable doubt that the prosecutor's statements regarding the credibility of K.M., Nichols, and Jablonski—even if improper—did not affect the outcome of the trial in light of the entire record.

*The district court did not abuse its discretion in denying Sprung's motion to compel a psychological examination of K.M.*

Next, Sprung argues the district court abused its discretion in denying his motion to compel a psychological examination of K.M. because there was "ample evidence" of K.M.'s lack of veracity and "little or no" corroborating evidence to support K.M.'s allegations. The State argues the district court appropriately denied the motion based on Sprung's failure to present compelling reasons for the examination.

Because a district court judge has discretion to order a psychological examination of the complaining witness in a sex crime case, we review the district court's denial of such a motion for an abuse of discretion. *State v. Berriozabal*, 291 Kan. 568, 580, 243 P.3d 352 (2010); *State v. Price*, 275 Kan. 78, 83, 61 P.3d 676 (2003); *State v. Gregg*, 226 Kan. 481, 489, 602 P.2d 85 (1979); see *Ward*, 292 Kan. at 550 (stating abuse of discretion standard of review).

A defendant is entitled to a psychological examination of a complaining witness if the defendant can demonstrate compelling circumstances that would justify such an examination. See *Berrioza-*

*bal,* 291 Kan. at 581; *Gregg,* 226 Kan. at 489. In *Berriozabal,* we stated:

"A determination of whether such compelling circumstances exist requires examination of the totality of the circumstances in the case, with the following nonexclusive list of factors to be considered:

"(1) whether there was corroborating evidence of the complaining witness' version of the facts,

"(2) whether the complaining witness demonstrates mental instability,

"(3) whether the complaining witness demonstrates a lack of veracity,

"(4) whether similar charges by the complaining witness against others are proven to be false,

"(5) whether the defendant's motion for a psychological evaluation of the complaining witness appears to be a fishing expedition, and

"(6) whether the complaining witness provides an unusual response when questioned about his or her understanding of what it means to tell the truth." 291 Kan. at 581.

Here, in support of his motion to compel a psychological examination of K.M., Sprung cited: (1) the lack of physical evidence to support K.M.'s allegations, (2) evidence that K.M. had a reputation for lying and had exhibited behavioral problems at school, and (3) evidence that K.M. made inconsistent statements about blood found in her underwear.

At the motion hearing, the district court heard testimony from two of K.M.'s teachers, the elementary school secretary, and one of K.M.'s friends. Karen Reedy, K.M.'s fourth- and fifth-grade teacher, testified that K.M. had anger problems, would often lie about her homework, would lie "to keep herself out of trouble," and sometimes used foul language in the classroom or on the playground. Reedy sent K.M.'s parents a letter regarding K.M.'s anger problems, but testified she did not believe that K.M.'s anger problems required professional intervention. Jolana Perkins, the school secretary, testified K.M. was in the principal's office for behavioral problems on 5 to 10 occasions during the 2005-2006 school year.

Janet Fuller, a Title I teacher, who regularly attended the church where Sprung was pastor and who admitted she and Sprung were very good friends, testified K.M. was the most ill-behaved and dishonest student in the school. Although Fuller never worked with K.M. specifically, she offered several instances of conduct to sup-

port her characterization of K.M, including that K.M.: (1) lied about a damaged library book; (2) tried to hide food in a milk carton at lunch; and (3) became angry at lunch when other kids would not pass the ketchup. Fuller also said K.M. frequently used foul language. Fuller opined that K.M. needed psychiatric help for her anger and lying problems. However, Fuller admitted she never referred K.M. to the school psychologist, but she stated that several teachers had informally discussed K.M.'s behavior.

Finally, K.M.'s friend and classmate, C.E., testified she recalled talking with K.M. regarding "blood being in some panties." But C.E. then testified that sometime during the girls' fourth-grade school year, K.M. "said that [K.M.'s] mom found bloody—a bloody sock in the bathroom, and [that the sock belonged to K.M.'s] sister [N.M.]." C.E. was sure the conversation was about a sock and not panties. C.E. denied that K.M. told her the blood was from K.M. rather than N.M. C.E. testified K.M. told her their conversation about the bloody sock was a "secret."

Ultimately, the district court found no compelling reasons to justify an examination and denied the motion. Specifically, the court reasoned that the use of vulgar language generally is not considered evidence of mental instability, that K.M.'s anger and lying problems generally related to homework and incidents on the playground, and that there was no evidence K.M. lied about sexual acts or about her contact with Sprung.

We have generally upheld the denial of motions to compel psychological examinations of victims under similar circumstances. See, *e.g.*, *Berriozabal*, 291 Kan. at 582 (finding evidence of unstable home environment insufficient to support allegation of mental instability; one possible incident of lying about defendant's former stepdaughter's virginity insufficient to support lack of veracity); *Price*, 275 Kan. at 88 (finding no compelling reasons to justify examination when evidence indicated victim made untruthful statement to a friend but statement was unrelated to contact with defendant, victim made no other false allegations of abuse, victim had engaged in prior sexual contact with her stepbrother, and victim referred to herself as a liar in a letter to her mother but later testified she was not lying about her contact with defendant); *State*

*v. McIntosh*, 274 Kan. 939, 946, 58 P.3d 716 (2002) (finding victim's bedwetting, diagnosis of attention-deficit disorder, behavioral problems at school, and resentment for absence of biological father insufficient to support mental instability).

Here, defendant presented no evidence that K.M. was mentally unstable. And while there was some evidence K.M. may have made untruthful statements or engaged in dishonest conduct in the past, those statements did not relate to her contact with the defendant or to any matter material to the allegations here. Nor is there any evidence that K.M. made similar charges against others that were later proven to be false. Based on the totality of the circumstances, we conclude the district court did not abuse its discretion when it denied Sprung's motion to compel a psychological evaluation of K.M.

*Sprung's sentencing claim fails for lack of appellate jurisdiction.*

Finally, Sprung challenges the constitutionality of the aggravated presumptive sentence on his sodomy conviction, arguing the district court improperly imposed the sentence without requiring the aggravating factors be proven to a jury beyond a reasonable doubt. Sprung recognizes that *State v. Johnson*, 286 Kan. 824, Syl. ¶ 5, 190 P.3d 207 (2008), controls this issue, but he nevertheless includes the issue to preserve it for federal review.

Under K.S.A. 21-4721(c)(1), appellate courts lack jurisdiction to review challenges to presumptive sentences. See *Johnson*, 286 Kan. at 851-52. Therefore, we affirm the Court of Appeals' dismissal of Sprung's sentencing challenge.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the district court is affirmed in part and reversed in part, and the sentence is vacated in part.