NOT DESIGNATED FOR PUBLICATION

No. 125,509

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL EDWARD MASTEL,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JENNIFER MYERS, judge. Oral argument held November 18, 2025. Opinion filed January 9, 2026. Affirmed in part, reversed in part, sentences vacated in part, and case remanded with directions.

*Emily Brandt*, of Kansas Appellate Defender Office, for appellant.

*Kayla L. Roehler*, deputy district attorney, *Njeri Mwangi*, deputy district attorney, *Mark A. Dupree Sr.*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., MALONE and BOLTON FLEMING, JJ.

PER CURIAM: Michael Edward Mastel appeals his convictions of one count of rape and three counts of sexual exploitation of a child. Mastel claims: (1) There was insufficient evidence to support his convictions of sexual exploitation of a child; (2) the district court erred in allowing the State to amend the information charging Mastel with sexual exploitation of a child after the evidence was presented; (3) the sexual exploitation of a child convictions were multiplicitous; and (4) the prosecutor's improper remarks during voir dire, cross-examination, and closing argument deprived Mastel of a fair trial.

1

We agree with Mastel that his convictions of three counts of sexual exploitation of a child were multiplicitous but otherwise affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In 2010, Mastel and his wife adopted J.M., who was around six years old at the time, and her younger sister S.M., who was five. In September 2018, J.M. ran away from home after an argument. Mastel called the police who found J.M. at a local pizza shop. J.M. alleged physical abuse by Mastel, so the police took her into protective custody and transported her to Sunflower House for a forensic interview. When asked if anyone was inappropriately touching her, J.M. responded no but disclosed that before being adopted by the Mastels, she had been sexually abused by a family member. The allegations of physical abuse were found unsubstantiated, and J.M. returned home.

About a month later, J.M. again ran away from home. The police found her at the same restaurant she had been found a month earlier. This time, she told the police that Mastel was molesting her. J.M. was again interviewed at Sunflower House. J.M. disclosed in that interview that Mastel had been raping her since she was adopted. J.M. also described times when Mastel touched her inappropriately and a time after they had sexual intercourse when Mastel took naked photographs of her on his cellphone.

Investigating officers obtained a search warrant for Mastel's spare cellphone and on it found evidence of three deleted photographs "of a female's vaginal area." A comparison of "distinguishing moles" on the female's thigh in the photographs to moles on J.M.'s thighs showed that the moles were the same.

In April 2019, the State charged Mastel under Jessica's Law with one count of rape, one count of aggravated criminal sodomy, and three counts of sexual exploitation of a child. The case proceeded to a jury trial beginning in September 2021. The jury

acquitted Mastel on the aggravated criminal sodomy count but did not reach a verdict on the remaining counts. The district court declared a mistrial on the remaining counts.

The State filed a second amended information in March 2022 that removed the aggravated criminal sodomy count. The amended information listed the date range for the three sexual exploitation of a child counts between March 1, 2018 and October 20, 2018.

The second jury trial was held on April 4, 2022 through April 8, 2022. We need only summarize a portion of the evidence. Erin Miller Wiess interviewed J.M. at Sunflower House on October 22, 2018. J.M. told Miller Wiess that Mastel had sex with her from the time she was adopted when she was six years old to just before she ran away the month earlier. J.M. disclosed that on one occasion about a year before the interview, after having sex on Mastel's bed, Mastel took photographs of J.M.'s vagina with his cellphone. J.M. described how Mastel asked her if he could take the photographs, J.M. initially said no, but Mastel kept asking and told J.M. he would delete the pictures later. When J.M. eventually relented, Mastel spread her legs and took a picture of her vagina.

J.M. also testified and her testimony largely mirrored her October 22, 2018 Sunflower House interview. J.M. described how in the early mornings or after school Mastel would rape her in his room or her room. She believed the first time Mastel raped her was when she was seven years old. When J.M. was in sixth grade she described that she was lying in Mastel's bed and Mastel "begged" her to let him take pictures of her vagina with the promise of deleting them later. J.M. did not want him to take the pictures, but she got tired of arguing with him, so she let him take the pictures.

Kansas City Police Detective Cotarino Mendez testified that he spoke with Mastel about J.M.'s allegations that he took inappropriate photographs of her, and Mastel turned over to Mendez a spare cellphone kept in the house. An initial search of the cellphone revealed no such photographs, so Mendez sent the cellphone to the crime lab for further

3

investigation. Mendez testified that an FBI agent eventually informed him that three deleted photographs were recovered from the cellphone. The photographs depicted "a female's vaginal area" but did not show the subject's face and only showed her lower extremities. Mendez contacted Children's Mercy Hospital to review footage taken during an examination of J.M. Mendez compared "distinguishing moles, marking on [J.M.'s] inner thigh and her vaginal area" and found that "those moles coincided with the pictures that were taken off of the phone." Mendez testified that the FBI report he received on the photographs indicated they were taken "between 3/18 and 5/19 of 2017."

Mastel testified in his defense. He denied having any sexual intercourse with J.M. and claimed she made up the allegations as part of a plan to be removed from Mastel's home. Mastel denied taking any photographs of J.M.'s "private areas" and was surprised to hear any photographs had been recovered from his cellphone. He claimed everybody who lived in the house had access to the cellphone.

After the close of evidence but before the jury reached a verdict, the State moved to amend the information to change the date range that it alleged the sexual exploitation of a child counts had occurred. The State sought to change the date range to begin August 30, 2016 until May 31, 2017, to conform to J.M.'s testimony that the photographs were taken when she was in the sixth grade and the FBI report indicating the photographs were taken between March and May 2017. Mastel briefly objected that the information should remain as it was filed. The district court allowed the amendment by finding that caselaw supported the State's right to amend the information before the jury reached a verdict and that Mastel could not have been surprised by the amendment because "the defense has had copies of this special agent's report as well as heard this testimony before."

During closing arguments the State focused on J.M.'s testimony and her statement in the second Sunflower House interview claiming that Mastel raped her repeatedly over the years and took sexually inappropriate photographs on one occasion. The defense

denied all wrongdoing, challenged J.M.'s credibility, and alleged she made up her allegations as part of a plan to be removed from Mastel's home. The defense also claimed that anyone including J.M. could have taken the photographs.

The jury found Mastel guilty on all counts. On May 31, 2022, the district court sentenced Mastel to concurrent life sentences on each count. Mastel timely appealed the district court's judgment. Additional facts will be set out below as necessary.

ANALYSIS

Mastel claims: (1) There was insufficient evidence to support his convictions of sexual exploitation of a child; (2) the district court erred in allowing the State to amend the information charging Mastel with sexual exploitation of a child after the evidence was presented; (3) the sexual exploitation of a child convictions were multiplicitous; and (4) the prosecutor's improper remarks during voir dire, cross-examination, and closing argument deprived Mastel of a fair trial. We will address each claim in turn.

*Sufficiency of the evidence*

Mastel claims there was insufficient evidence to support his convictions of three counts of sexual exploitation with a child. More specifically, he argues that insufficient evidence supported the jury's finding that he intended to promote a performance of sexually explicit conduct when taking photographs of J.M.'s vagina. The State asserts it presented sufficient evidence at trial to support the convictions.

> "'When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

5

K.S.A. 2016 Supp. 21-5510(a)(1) defines the sexual exploitation of a child as: "Employing, using, persuading, inducing, enticing or coercing a child under 18 years of age, or a person whom the offender believes to be a child under 18 years of age, to engage in sexually explicit conduct with the intent to promote any performance." The district court instructed the jury that to establish the charge of sexual exploitation of a child, the State needed to prove that Mastel, "with the intent to promote a performance, persuaded, induced, enticed or coerced J.M. to engage in sexually explicit conduct."

Mastel argues: "The record . . . is devoid of how [Mastel] used the photographs he allegedly took. And without that, the jury did not have sufficient evidence to prove beyond a reasonable doubt that he intended to promote a performance." Mastel cites *State v. Johnson*, 56 Kan. App. 2d 1293, 1313, 447 P.3d 1010 (2019) where this court held evidence about how the defendant uses the product resulting from the sexual exploitation of a child speaks to the intent element under K.S.A. 21-5510(a)(1). And because there was no evidence produced at trial on how he used the photographs or what he did with them, Mastel asserts the intent element here was unsupported.

Mastel ignores that evidence of the circumstances in which he took the photographs creates a reasonable inference that he intended to promote a performance of sexually explicit conduct. J.M. stated in her October 22, 2018 interview at Sunflower House that Mastel asked to take photographs of her vagina after the two had sexual intercourse, and that Mastel did in fact take the photographs. J.M. originally said no to Mastel's request but eventually relented. That evidence, along with J.M.'s testimony at trial, shows that Mastel intended to promote a performance of sexually explicit conduct. When reviewing evidence in the light most favorable to the State, "all of the facts and circumstances, including the reasonable inferences that can be drawn therefrom, must be considered." *State v. Darrow*, 304 Kan. 710, 716, 374 P.3d 673 (2016).

6

Mastel does not challenge the sufficiency of the evidence to support any other element of the crime. Thus, we conclude there was sufficient evidence of taking the photographs to support his conviction of sexual exploitation of a child.

*Amending the information after the evidence was presented*

Mastel claims the district court erred in allowing the State to amend the date range on the sexual exploitation of a child counts at the close of evidence. The State asserts the district court did not abuse its discretion in allowing the State to amend the information to conform to the evidence at trial. The State's ability to amend an information is addressed in K.S.A. 22-3201(e), which provides: "The court may permit a complaint or information to be amended at any time before verdict or finding if no additional or different crime is charged and if substantial rights of the defendant are not prejudiced."

An appellate court reviews the district court's decision to allow the State to amend an information for an abuse of discretion. *State v. Bischoff*, 281 Kan. 195, 205, 131 P.3d 531 (2006). A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025). The party claiming an abuse of discretion bears the burden of showing it. *State v. Peters*, 319 Kan. 492, 497-98, 555 P.3d 1134 (2024).

The second amended information alleged that sexual exploitation of a child counts occurred on or between March 1, 2018 and October 20, 2018. At the close of the evidence, the State sought to change the date range to allege the crimes were committed on or between August 30, 2016 to May 31, 2017, to conform to J.M.'s testimony that the photographs were taken when she was in the sixth grade and the FBI report that the photographs were taken between March and May 2017.

7

Mastel does not claim the State's amendment during trial added a new charge. He instead focuses on how the amendment prejudiced his substantial rights. Mastel argues that because the State knew the evidence would show the photographs were taken in 2017, the State should have amended the information before trial, not after the close of evidence. Mastel argues that because the State waited until after it had submitted its evidence, he was prejudiced because the sexual exploitation of a child counts should have been dismissed on a motion for judgment of acquittal but for the amendment allowing the State to change the date range on those counts.

Mastel's argument is flawed. The Kansas Supreme Court has held that the exact date an offense was allegedly committed is not an element of the crime, provided the evidence shows the crime was committed within the period of the statute of limitations. *State v. Stafford*, 296 Kan. 25, 55, 290 P.3d 562 (2012). Mastel would not have been entitled to a judgment of acquittal on the sexual exploitation of the child counts even if the information had not been amended at the close of the evidence. And as the district court found, Mastel was not prejudiced by the amendment of the dates to conform to the evidence because he had the report before trial showing when the photographs were taken, so there was no surprise. Moreover, Mastel was asserting a general denial defense to the charges which did not depend on the dates of the photographs.

A similar issue was considered in *State v. White*, 316 Kan. 208, 213-15, 514 P.3d 368 (2022). The State charged White with aggravated indecent liberties with a child after he admitted to raping his granddaughter. When the trial began, the information listed the date range on one of the counts as occurring in 2009 when the victim was eight years old. But evidence at trial showed the offense occurred when the victim was seven or eight years old. So on the fourth day of trial the State moved to amend the date range for the count, which the district court granted. 316 Kan. at 211. On appeal, White argued his ability to present an alibi defense was prejudiced by the amendment. The Supreme Court disagreed and found no abuse of discretion in a brief analysis where it found that White's

8

alibi defense at trial was minimally developed and the record did not show how the amendment had any impact on that defense. 316 Kan. at 213-15.

Mastel does not dispute that he knew before trial that the written report would indicate the photographs were taken in 2017. And Mastel's defense to the charges did not depend on when the photographs were taken. Mastel fails to show he was prejudiced by the amendment. Thus, we conclude the district court did not abuse its discretion in allowing the State to amend the information after the evidence was presented.

*Multiplicitous convictions*

Mastel claims the sexual exploitation of a child convictions were multiplicitous. The State's brief contests this claim, but in oral argument the State conceded that Mastel's three convictions of sexual exploitation of a child were multiplicitous.

Mastel brings this claim for the first time on appeal. Multiplicity is an issue Kansas appellate courts traditionally will address for the first time on appeal to serve the ends of justice or to prevent the denial of fundamental rights. *State v. Colston*, 290 Kan. 952, 971, 235 P.3d 1234 (2010), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016); *State v. Dubish*, 234 Kan. 708, 718, 675 P.2d 877 (1984).

> "Multiplicity is the charging of a single offense in several counts of a complaint or information. Multiplicity creates the potential for multiple punishments for a single offense in violation of the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. [Citations omitted.]" *State v. Sprung*, 294 Kan. 300, 306, 277 P.3d 1100 (2012).

"Whether convictions are multiplicitous is a question of law subject to de novo review." 294 Kan. at 306. When analyzing claims of multiplicity, the overarching inquiry is whether the convictions are for the same offense. This inquiry is divided into two

9

components, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? (2) If so, by statutory definition, are there two offenses or only one? *State v. Eckert*, 317 Kan. 21, 25, 522 P.3d 796 (2023).

Several factors guide the analysis on whether convictions arose from the same conduct: "(1) the acts occurred at or near the same time, (2) the acts occurred at the same location, (3) a causal relationship existed between the acts, in particular whether an intervening event separated the acts, and (4) a fresh impulse motivated some of the conduct." *Sprung*, 294 Kan. at 307. Mastel's convictions of sexual exploitation of a child arose from the same conduct. The sexually explicit photographs of J.M. were taken at the same time, in the same location, there was no intervening event between the photos, and no fresh impulse motivated each photo.

Turning to the second question, because Mastel's convictions arose from the same statute, we apply the unit of prosecution test to determine whether the Legislature intended multiple offenses or only one. *Eckert*, 317 Kan. at 25-26 ("Under the unit of prosecution test, 'the statutory definition of the crime determines what the Legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution.'"). Mastel was convicted under K.S.A. 2016 Supp. 21-5510(a)(1) which prohibits a person from persuading a child to engage in sexually explicit conduct with the intent to promote any performance. This statutory language supports only one conviction of sexual exploitation of a child where Mastel persuaded J.M. to allow him to take sexually explicit photographs on only one occasion. The fact that Mastel took three photographs instead of one does not support three convictions of sexual exploitation of a child under K.S.A. 21-5510(a)(1). See *State v. Henning*, No. 115,832, 2017 WL 3837224, at *8 (Kan. App. 2017) (unpublished opinion) (upholding only one conviction of sexual exploitation of a child where defendant took four sexually inappropriate videos of a child within an eight-minute span).

Thus, we agree that Mastel's three convictions of sexual exploitation of a child under K.S.A. 2016 Supp. 21-5510(a)(1) were multiplicitous. We reverse two of Mastel's convictions of sexual exploitation of a child and vacate his sentences for these convictions.

*Prosecutorial error*

Mastel claims the prosecutor's improper remarks during voir dire, cross-examination, and closing argument deprived him of a fair trial. The State concedes one instance of prosecutorial error in closing argument but asserts it was harmless.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

(1) *The voir dire incident*

Mastel first claims the prosecutor erred during voir dire where she told the venire panel, "And after you've heard all the evidence that will be presented, if you believe [J.M.] is telling the truth, then you have all the evidence you need to find the defendant guilty of the crimes charged." Mastel claims that statement improperly bolstered J.M.'s

11

credibility. The State responds that this comment was not error, and when viewed with more context the statement does not bolster J.M.'s credibility.

We agree with the State and find no error. Immediately before making the above statement, the prosecutor explained to the venire panel that the law does not favor one form of evidence over another form and that it was possible that the jury could be presented with one type of evidence or multiple types. The prosecutor continued to explain that so long as the State presented any kind of evidence and so long as it had proven all the elements beyond a reasonable doubt, then the jury could find Mastel guilty. The prosecutor then made the challenged statement above.

With this added context, the prosecutor did not bolster J.M.'s credibility. Instead, the prosecutor simply explained to the prospective jurors that, after hearing all the evidence and assuming the jury believed J.M.'s version of events, then the jury could find the State presented enough evidence to convict based on "all the evidence that will be presented." In other words, the prosecutor was correctly explaining to the prospective jurors that J.M.'s testimony alone, if believed, would be enough for the jury to convict Mastel even without corroborating physical evidence. This statement was not error.

(2) *The cross-examination incident*

Next, during cross-examination of the defense witness R.C., J.M.'s placement after the leaving the Mastel house, the prosecutor asked the following: "Now, everything that you've talked about, you weren't there when [J.M.] was being raped by the defendant, were you?" Defense counsel objected on the ground that the question assumed Mastel's guilt and the district court overruled the objection. Even though the district court overruled the objection, the prosecutor rephrased the question to: "So you weren't there when any of the things that [J.M.] reported having happened to her, the sexual abuse from

the defendant, you weren't there, correct?" There was no objection to the rephrased question. R.C. responded, "I was not there when the accusations took place, no."

Mastel points to the prosecution's question about R.C. not being there while Mastel raped J.M. and argues that the question was error in that it assumed Mastel's guilt. The State responds that the rephrased question corrected any problem and there was no error, but to the extent there was any error it was harmless.

A defendant may assert a claim of prosecutorial error committed by the prosecutor in examining a witness, but the claim must be preserved with a contemporaneous objection to satisfy the requirements of K.S.A. 60-404. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009). Mastel timely objected to the prosecutor's initial question to R.C. "While a prosecutor's questions at trial may not be evidence, such questions call for an answer, and both the question and answer given become part of the evidentiary or prosecutorial misconduct claim." 288 Kan. at 346-47. The prosecutor's initial question to R.C. was improper to the extent it assumed Mastel was guilty of rape, falling outside the wide latitude afforded a prosecutor to conduct the State's case. The error was compounded by the fact that the judge overruled the objection rather than instructing the jury to disregard the question. So even though the prosecutor rephrased the question, we agree with Mastel that it amounted to an instance of prosecutorial error. We will address prejudice individually and collectively at the end of this section of the opinion.

(3) *Rhetorical questions and responses in closing argument*

Next, during closing argument the prosecutor addressed the defense claim that J.M. was motivated to make allegations against Mastel because she wanted to go live with her brother. The prosecutor then said:

13

"I submit to you that has nothing to do with why we're here today. Did she want to go live with her brother? Yes, she did. Did the defendant rape her? Yes, he did. Did he take photographs of her? Yes, he did. Did [J.M.] get to go live with her brother? No. that didn't work out. [S.M. is] who got adopted."

Mastel points to the prosecutor's rhetorical questions and argues those questions were error because they were a personal comment on the evidence. The State asserts that the prosecutor's comments were in context of discussing the evidence presented at trial and there was no error, but to the extent there was any error it was harmless.

The Kansas Supreme Court has approved a prosecutor's use of rhetorical questions to encourage the jury to consider whether a witness had any motive to be untruthful. *State v. Jordan*, 317 Kan. 628, 649, 537 P.3d 443 (2023). But when the prosecutor asks rhetorical questions and answers them with a personal comment, the court has found error. *State v. Sprague*, 303 Kan. 418, 428, 362 P.3d 828 (2015); see also *State v. Marks*, No. 126,492, 2025 WL 2993738, at *12 (Kan. App. 2025) (unpublished opinion). Here, the prosecutor's answers to her own rhetorical questions amounted to a personal comment on the evidence. We find the comments to be prosecutorial error, and we will address prejudice individually and collectively at the end of this section of the opinion.

(4) *The prosecutor's "what we do know" statement in closing argument*

Another time during closing argument the prosecution stated:

"A lot was made about he cooperated. He turned over the phone. Would somebody who's done something like that—we don't know what his intentions were, what he was thinking about when he did what he did in talking to the police, turning over the phone. *What we do know* is when he was taking these photographs, that was his intent. It was for his gratification, his sexual gratification. That is the only reason you

14

would take naked pictures of a child's vagina. It is for your sexual gratification, for his sexual gratification." (Emphasis added.)

Mastel claims that the prosecutor asserting "What we do know" was error because she made an inference either not based on the evidence or based on contested evidence. The State concedes that the statement was error under *State v. King*, 308 Kan. 16, 34-36, 417 P.3d 1073 (2018). The prosecutor in *King* made several statements of purported fact to the jury beginning with the phrase, "We know." 308 Kan. at 34. The Supreme Court found this was error because "the prosecutor was drawing inferences for the jury, not stating uncontroverted evidence." 308 Kan. at 34. We agree the prosecutor's "what we do know" statement was error in accordance with the ruling in *King*, and we will address prejudice individually and collectively at the end of this section of the opinion.

(5) *Comment in closing argument on prior abuse*

Finally, Mastel argues that the prosecutor "misstated the evidence" in closing argument by suggesting that J.M.'s prior abuse was actually Mastel's doing. We must provide additional facts to understand this claim. In J.M.'s first interview at Sunflower House, she disclosed that before being adopted by the Mastels, she had been sexually abused by a family member, specifically a brother. It was this abuse that caused J.M. to be removed from her biological home and eventually adopted by the Mastels. The district court had ruled that the parties could refer to this prior abuse at trial but were "not to discuss any specifics" with any witness. In accordance with the district court's ruling, there was very little reference to a claim of prior abuse during the five-day jury trial. In closing argument, defense counsel argued that J.M. had made up the allegations that Mastel sexually abused her because she knew from experience that such allegations would cause her to be removed from Mastel's home. During the State's rebuttal closing, in response to this argument, the prosecutor stated:

"Mention about her having sexual exposure because she was abused prior. Folks, the sexual exposure that she got was from the defendant when he would come into her room sometimes in the morning, when he—when she came from school and he was in his room in the afternoons, call her in there and rape her, that's the sexual exposure. She told you sometimes she's on her back. Sometimes she's on top. He would direct what was happening. He's the one putting his penis in her vagina. He's the one exposing her to all these sexual things. He's the one raping her."

Mastel argues that "[i]t was thus error for the prosecutor to misstate the evidence, telling the jury that the prior sexual exposure was because of [Mastel] when the evidence at trial tended to show that there was prior sexual abuse by someone other than [Mastel]." The State does not respond to this argument.

Prosecutors err by arguing a factual inference with no evidentiary foundation. *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019). But we do not interpret the prosecutor's isolated statement as Mastel interprets it. While the prosecutor's statement may have been clumsy, she did not appear to be arguing that Mastel was responsible for the prior sexual abuse. Such an assertion would make no sense because what little evidence the jury heard about prior abuse indicated it was from a family member, which is what caused J.M. to be removed from her biological home and eventually adopted by the Mastels. The prosecutor said that "the sexual exposure that [J.M.] got was from the defendant," not that the *prior* sexual exposure came from the defendant. Considering the statement in context with the evidence presented at trial, the prosecutor was merely asserting that Mastel had sexually assaulted J.M. over a long period of time after she was adopted by the Mastels. That assertion was supported by J.M.'s testimony.

Mastel points out that during deliberations the jury asked for clarification on the evidence of prior abuse before J.M. was placed into Mastel's home, implying that the prosecutor's statement in closing argument confused the jury on this subject. The district court responded that the jurors needed to rely on their "collective memories" of the

16

evidence. We cannot read anything into the motivation for the jury's question. We conclude the prosecutor did not misstate the evidence, thus there was no error.

To sum up, we have found three instances of prosecutorial error during the trial. First, the prosecutor asked a witness a question in a manner that assumed Mastel was guilty of rape. Second, the prosecutor asked and answered rhetorical questions about the evidence in closing argument, personally commenting on the evidence in the process. Third, the prosecutor made one statement about the evidence in closing argument preceded with the words "what we do know," inferring the evidence was uncontroverted. These instances of prosecutorial error were brief and isolated. It was a five-day jury trial. The prosecutor voluntarily rephrased the improper question of the witness to mitigate the harm. As for the comments in closing argument, the district court instructed the jury that statements of counsel are not evidence and should be disregarded if not supported by the evidence. We presume the jury followed the instructions. *State v. Weis*, 47 Kan. App. 2d 703, 714, 280 P.3d 805 (2012). We find the instances of prosecutorial error, individually and collectively, to be harmless beyond a reasonable doubt with no reasonable possibility that the errors contributed to the verdict. *Sherman*, 305 Kan. at 109.

CONCLUSION AND REMAND ORDER

We agree with the parties that Mastel's three convictions of sexual exploitation of a child under K.S.A. 2016 Supp. 21-5510(a)(1) were multiplicitous but otherwise affirm the district court's judgment. As a result, we reverse two of Mastel's convictions of sexual exploitation of a child and vacate his sentences for these convictions. Because Mastel received concurrent life sentences on each count, this disposition will not change Mastel's controlling sentence. Mastel need not be resentenced. We remand the case with directions for the district court to file a corrected journal entry of judgment showing convictions under Jessica's Law of one count of rape and one count of sexual exploitation of a child with concurrent off-grid life sentences for each conviction.

Affirmed in part, reversed in part, sentences vacated in part, and case remanded with directions.