NOT DESIGNATED FOR PUBLICATION

No. 119,452

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

STEVEN JON SNYDER,
*Appellant*.

MEMORANDUM OPINION

Appeal from Saline District Court; JARED B. JOHNSON, judge. Opinion on remand filed October 30, 2020. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Jennifer C. Roth*, of Kansas Appellate Defender Office, for appellant.

*Ellen Mitchell*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., MALONE and STANDRIDGE, JJ.

PER CURIAM: Steven J. Snyder appeals following his convictions of two counts of rape, one count of attempted rape, two counts of aggravated indecent liberties with a child, and one count of kidnapping. Snyder claims: (1) the State committed reversible prosecutorial error during closing argument; (2) the district court committed reversible error by denying his request to use demonstrative exhibits during closing argument; (3) even if the first two errors do not independently require reversal, they do so when considered cumulatively; (4) there was insufficient evidence to support his kidnapping conviction; (5) the district court committed reversible error in instructing the jury on kidnapping; (6) Snyder's convictions of aggravated indecent liberties were multiplicitous;

1

(7) the district court erred by ordering consecutive sentences; and (8) the district court erred by ordering lifetime postrelease supervision. We agree with Snyder that there was insufficient evidence to support his kidnapping conviction and that his convictions of aggravated indecent liberties were multiplicitous. We also agree that the district court erred by ordering lifetime postrelease supervision. Thus, we affirm in part, reverse in part, vacate in part, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

The parties are aware of the extensive factual and procedural history of this case. We will set forth the facts only to the extent necessary to address the issues Snyder has raised on appeal. Snyder met A.B. (Mother) in 2005, and they began an off-and-on romantic relationship. Their first daughter, K.B., was born in 2006 and their second daughter, H.S., was born in 2010.

In 2014, Mother's sister's son, D.L., was charged in juvenile proceedings with molesting K.B. Snyder asserts that he was the individual who reported to police that D.L. had molested K.B. and that doing so strained his relationship with Mother. Their relationship became so strained that Mother asked him to relinquish his parental rights to K.B. and H.S., but Snyder refused to do so. In December 2014, Mother, H.S., and K.B. moved into a new home, and Snyder went to live with his parents. Even though they were separated, Snyder would watch the girls at Mother's house while Mother worked in the basement, taking calls for a cell phone insurance company.

In April 2015, H.S. told Mother that Snyder "had touched her 'puter,'"—H.S.'s word for vagina—with his "turkey"—H.S.'s word for penis. Mother asked H.S. if she was sure, and H.S. said she was. Mother called Snyder, who denied it, and Mother did not report H.S.'s accusation to the police. Mother thought that H.S. was trying to get attention because Mother was putting so much attention into D.L. molesting K.B.

2

Mother and Snyder continued their "on and off" relationship, but at some point in 2015, Snyder stopped taking care of the girls at Mother's home while she worked. On November 16, 2015, Mother opened the door to H.S.'s bedroom and saw her lying on the bed on her back with her feet on the wall, naked, with her body in "a 'v'" position and her fingers in her vagina. Startled, H.S. pulled her fingers out of her vagina. Mother told H.S. not to do that because she could hurt herself, and H.S. said, "'But Mommy my Daddy does it.'" Mother asked what H.S. meant, and H.S. replied "'He takes his turkey and puts it on my puter.'" Mother did not question H.S. further at the time; instead, she told H.S. "'that's not supposed to happen'" and put H.S. to sleep in her bed. Mother tried to call Snyder, but she could not reach him. She also called Maternal Grandmother and told her what H.S. had said; Maternal Grandmother advised her to call the police.

Mother called the Salina Police Department on November 18, 2015. She told the dispatcher that she "need[ed] to report child molestation" of her daughter. When asked if she knew what happened or who molested her daughter, Mother replied, "Her dad," and gave Snyder's name. Mother explained that she "caught [H.S.] playing with herself and we had a discussion and she told me that her dad would touch her." The dispatcher told Mother that they would send someone to speak with her.

Officers Andrew Meek and Jon Roberts responded to the call. Mother told them that she had seen H.S. "playing with herself" two days earlier, so she asked H.S., "Has anybody done that to you?" and H.S. replied, "My daddy." After explaining to Roberts that H.S.'s "word for penis is turkey" and her word for vagina is "puter," Mother said that H.S. told her that Snyder "took his turkey and put it in my puter."

Mother explained that H.S. had made similar comments the previous April, but Mother thought she was making the comments to get attention, "like her older sister is getting attention" because of D.L.'s ongoing juvenile proceedings. Mother said that Tuesday evening—the night before Mother called the police—H.S. also told her about a

3

time when Snyder was watching television with K.B. and H.S. and he had a blanket over H.S. "and he was messing with her." H.S. had told Mother that Snyder had touched her "underneath my flower blankie." Mother also said that she had asked K.B. if Snyder had done anything to her and K.B. denied that anything happened.

Detective Crystal Marks was assigned to the case and she scheduled a forensic interview for H.S. on November 20, 2015. Highly summarized, H.S. told Marks that her dad had put his "puter" on her "puter" more than one time. On November 25, 2015, Marks interviewed K.B., who stated that her cousin had molested her but that no one else had ever touched her in a place she did not like. That same day, Snyder was arrested and charged with three counts of rape of H.S.

Mother began taking H.S. and K.B. to counseling. In November 2016, K.B. told her therapist that Snyder had touched her inappropriately when she was nine years old. When Marks learned that K.B. had disclosed that Snyder had molested her, she scheduled a second forensic interview with K.B. During the second interview, K.B. said that Snyder made her touch his penis and that he tried to touch her vagina. K.B. said that she, H.S., and Snyder were in Snyder's room on his bed, and H.S. was "sound asleep." K.B. said, "He was trying to pull down my pants. But then I got to escape. But then he dragged me back in the room." She clarified that Snyder unbuttoned and unzipped her pants and pulled them and her underwear down. K.B. told Snyder that she had to go to the bathroom, where she tried to lock the door, "but somehow he got in."

When Marks took K.B. through the events, asking for more detail, K.B. said that Snyder's hands were "right there" when she made her excuse to escape, and she pointed to her abdominal/genital area. Marks asked if Snyder's hands were "on your vagina" and K.B. nodded and agreed. At this point in the interview, K.B. said that Snyder had rubbed his hand "on the outside" of her vagina for "a minute" before she said she had to go to the

bathroom. K.B. stated that her pants were around her ankles when she went into the bathroom, and she closed the bathroom door.

When Snyder opened the bathroom door, K.B. tried to crawl out to run away and get outside, but Snyder grabbed her arm, so she tried to kick him and tried to escape. Later in the interview, K.B. said after Snyder grabbed her arm, "he like tried to pull me, so I kicked him." Then, still in the bathroom, Snyder rubbed the outside of her vagina by putting his hand inside her underwear. K.B. said that the bathroom door was shut again when Snyder rubbed her vagina, at which point, H.S. had woken up and was trying to get into the bathroom.

Later in the interview, K.B. told Marks that earlier during the same nap, Snyder had grabbed her hand and made her touch his penis and he ignored her when she told him to stop. K.B. estimated that the entire nap was 30 minutes to an hour. K.B. said she touched his penis for about a minute and it was "slimy" and "soft like a worm." K.B. said that when she pulled her hand away, Snyder began pulling her pants down. Toward the end of the interview, Marks asked K.B. about her initial comment that Snyder dragged her back into the bedroom. K.B. said he had not dragged her into the bedroom, he dragged her back into the bathroom when she was trying to escape.

As a result of these statements, the State charged Snyder in a new criminal case with three counts of aggravated indecent liberties with a child and one count of kidnapping. With the district court's permission, the State consolidated the two cases against Snyder, resulting in one case charging three counts of raping H.S., three counts of committing aggravated indecent liberties with K.B., and one count of kidnapping K.B.

The five-day jury trial began on August 28, 2017. We will not recite all the evidence admitted at the trial. Marks testified about her forensic interview with the

children. H.S. testified and, highly summarized, described three times that Snyder touched or tried to touch her "puter" with his "puter."

K.B. also testified. K.B. testified that Snyder had touched her private parts in his bedroom when she was nine years old. K.B. testified that her grandparents were out shopping, and H.S., K.B., and Snyder were in his bedroom to take a nap. All three of them were under the covers and Snyder unbuttoned her pants, pulled the zipper down, and pulled her pants down. K.B. testified that she "thought he was going to try to touch" her, so she "made an excuse to get out" by asking asked Snyder if she could go to the bathroom. She then went to the bathroom, shut and locked the door, and "stay[ed] in there until" Snyder's parents came home. K.B. maintained that Snyder did not come into the bathroom, he never asked her to touch him, she never touched him, and she did not remember telling Marks that she touched his penis. K.B. did, however, remember telling Marks that Snyder "did it a second time, and he got [her] pants and [her] panties down, and then [she] went to go to the bathroom and he came in."

As for the second time, K.B. testified that she, H.S., and Snyder again were taking a nap in Snyder's bedroom, but this time H.S. and Snyder were under the covers and K.B. was not. K.B. was lying back to back with Snyder when "he pulled [her] over and then he pulled down [her] pants." K.B. testified that Snyder undid her pants, pulled her pants and underwear down around her thighs, and rubbed the front of her vagina with his hand for about a minute until she asked to go to the bathroom. Once again, K.B. said that Snyder was clothed, she did not touch him, and she did not see his "private part."

K.B. testified she went to the bathroom and shut the door. Snyder then came into the bathroom. K.B. testified that Snyder "pulled down my pants again, and then my panties, and then he went to touch me and then like he was still standing up, so I crawled underneath his legs and then I ran outside." On further questioning, K.B. testified that while they were in the bathroom, Snyder again moved his hand back and forth on her

vagina. On cross-examination, K.B. testified that she told Mother what had happened when she got home, and that the second incident happened in the summer of 2015.

The State also presented evidence that the distance from Snyder's bedroom to the bathroom was 2 feet, 11 inches. After the State rested, Snyder moved for a judgment of acquittal for insufficient evidence on the rape and kidnapping charges, and he argued that the charges of aggravated indecent liberties with K.B. were multiplicitous. The district court reserved ruling on the multiplicity argument and denied the rest of the motion.

Snyder testified on his own behalf. He denied touching H.S. inappropriately, he denied exposing himself to her, and he stated that he had never heard H.S. use the term "puter." Similarly, he denied K.B.'s allegations. He also testified that he was never alone with his children in his home.

At the close of the evidence, Snyder again argued to the district court that the three charges of aggravated indecent liberties with K.B. were multiplicitous because they arose from the same conduct. The State conceded that Snyder had a point about two of the charges, and the district court ruled that those two charges should merge into one. After the merger, two charges of aggravated indecent liberties with K.B. remained:  one based on Snyder's alleged behavior in his bedroom, and one based on his alleged behavior in the bathroom. The district court held that these two charges were not multiplicitous because they were separate instances of conduct.

In accordance with the district court's order merging two of the aggravated indecent liberties charges, the State filed a fourth amended information, charging Snyder with three counts of rape of H.S., two counts of aggravated indecent liberties with K.B., and one count of kidnapping K.B. On two of the rape charges, the district court instructed the jury that it could also find Snyder guilty of the lesser included offense of attempted rape. After about three hours of deliberation on September 1, 2017, the jury found Snyder

7

guilty of two counts of rape and one count of attempted rape of H.S., two counts of aggravated indecent liberties with K.B., and one count of kidnapping K.B.

On April 23, 2018, the district court sentenced Snyder to 59 months' imprisonment for the kidnapping conviction and to life imprisonment with no chance of parole for 25 years on each of the remaining five convictions. The district court ordered Snyder to serve the kidnapping sentence, one of the hard 25 rape sentences, and one of the hard 25 aggravated indecent liberties with a child sentences consecutively, with the remaining sentences running concurrent. From the bench, the district court ordered Snyder to serve lifetime postrelease supervision for each conviction except kidnapping. Snyder timely filed a notice of appeal from the district court's judgment.

On appeal, Snyder does not challenge the sufficiency of the evidence to support his convictions of rape or attempted rape of H.S. Likewise, Snyder does not challenge the sufficiency of the evidence to support a conviction of aggravated indecent liberties with K.B., but he argues there should only be one conviction of this crime and not two. Snyder claims:  (1) the State committed prosecutorial error during closing argument; (2) the district court erred by denying his request to use demonstrative exhibits during closing argument; (3) the first two errors require reversal when considered cumulatively; (4) there was insufficient evidence to support his kidnapping conviction; (5) the district court erred in instructing the jury on kidnapping; (6) Snyder's convictions of aggravated indecent liberties were multiplicitous; (7) the district court erred by ordering consecutive sentences; and (8) the district court erred by ordering lifetime postrelease supervision.

DID THE STATE COMMIT PROSECUTORIAL ERROR DURING CLOSING ARGUMENT?

Snyder first claims the State committed reversible prosecutorial error during closing argument. He argues that certain statements constituted error by improperly bolstering the credibility of the State's witnesses and by shifting the burden of proof to

the defense. During closing argument, the prosecutor discussed the evidence the State had presented at trial, including

> "all of the digital media that was introduced to you in this case; the 9-1-1 call, the Axon of the officer that captures the demeanor of [Mother] when she was very first reporting this to the authorities, and the forensic interviews of these children, *which were taken and captured so much closer in time to when the molest[ing] occurred compared to, what, two years later, when they have to come into court in front of a room of strangers, and their father, sitting just feet away from them*." (Emphasis added.)

While discussing H.S.'s allegations against Snyder, the prosecutor said: "So when you consider the consistency, the corroboration, the credibility, the additional disclosures over time, ask yourselves *what motive does six-year-old [H.S.] have to falsify or distort this conspiracy of sexual abuse against her dad now*." (Emphasis added.) Later in closing argument, the State acknowledged the differences between K.B.'s trial testimony and her 2016 statements to Marks, telling the jury: "In her forensic interview, [K.B.] clearly said that she had to touch his penis. . . . Wet and slimy and everything. In court, when he is feet away from her, she *could not* say that." (Emphasis added.) And finally, toward the end of its initial closing argument, the State asked the jury, "What motive does [Mother] have for this?" and instructed: "*As you assess this case, consider consistency, corroboration, what motive do these children have to make this up, what motive does he have*. You assess the credibility of the witnesses." (Emphasis added.)

Kansas courts use a two-step process to analyze claims of prosecutorial error:

> "'To determine if the prosecutor erred, "the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." If the court finds error, the burden falls on the State to demonstrate "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire

9

record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict."' [Citations omitted.]" *State v. James*, 309 Kan. 1280, 1306-07, 443 P.3d 1063 (2019).

Snyder's only specific arguments are that the comments quoted above, taken together, implied to the jury that Snyder had "to prove motive" and that the prosecutor's statement that K.B. "could not" tell the truth in front of Snyder "was vouching for the truth of [K.B.'s] second forensic interview." Both arguments fail.

"Kansas caselaw provides that it is ""improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof."" But even so, ""considerable latitude [is] granted to prosecutors to comment on the weakness"' of the defense.' [Citations omitted.]" *State v. Blansett*, 309 Kan. 401, 414, 435 P.3d 1136 (2019).

Snyder argues that the prosecutor impermissibly shifted the burden of proof through her comments on Snyder's, Mother's, K.B.'s, and H.S.'s possible motives to make the statements that they did, leaving him required to prove that he had no motive to lie. But improper burden shifting occurs, for example, when a prosecutor asks the jury whether there was ""any evidence that [the crimes] didn't happen? Is there any evidence that the things [the victim] told you didn't happen?"" See *State v. Tosh*, 278 Kan. 83, 92, 91 P.3d 1204 (2004), *overruled on other grounds by State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016). The comments Snyder highlights in this appeal simply asked the jury to consider the various witnesses' motives for their statements, the comments did not shift the burden of proof to Snyder. See *State v. Ross*, 310 Kan. 216, 222, 445 P.3d 726 (2019) ("A prosecutor does not shift the burden of proof by highlighting the implausibility of a defendant's account.").

Moreover, none of the comments Snyder now challenges impermissibly vouch for any witness' credibility. Certainly, "a prosecutor is not allowed to offer a personal opinion

10

on credibility." *State v. Williams*, 299 Kan. 911, 935, 329 P.3d 400 (2014). And prosecutors are not allowed to accuse witnesses of lying or inform the jury that a witness is telling the truth. For example, a prosecutor may not argue "during closing argument that a witness was 'brutally honest' and 'was on the stand telling you the truth.'" *State v. Knox*, 301 Kan. 671, Syl. ¶ 3, 347 P.3d 656 (2015).

But asking a jury to consider possible motives behind a witness' statements and evaluate witness credibility differs from vouching for a witness' credibility. In *State v. Ortega*, 300 Kan. 761, 335 P.3d 93 (2014), the Kansas Supreme Court recognized:

"Although it is improper for a prosecutor to offer his or her personal opinion as to the credibility of a witness, a prosecutor has '"freedom . . . to craft an argument that includes reasonable inferences based on the evidence"' and, 'when a case turns on which [version] of two conflicting stores is true, [to argue] certain testimony is not believable.' For example, it is not improper for a prosecutor to offer 'comments during closing argument regarding the witness' motivation [or lack thereof] to be untruthful.' But a prosecutor must do so by basing the comment on evidence and reasonable inferences drawn from that evidence and without stating his or her own personal opinion concerning a witness' credibility or accusing a witness or defendant of lying. [Citations omitted.]" 300 Kan. at 775-76.

Even before *Ortega*, the Kansas Supreme Court held that statements like the ones Snyder now challenges were not improper. In *State v. Finley*, 273 Kan. 237, 247, 42 P.3d 723 (2002), the Kansas Supreme Court considered a prosecutor's comment that the defendant and his girlfriend "'are the only ones that really have a motive to fabricate any lies in this case'" and concluded that it was "a fair comment based on reasonable inferences from the evidence." In *State v. King*, 288 Kan. 333, 353, 204 P.3d 585 (2009), the court held that a prosecutor's argument that the victim "was not the person who had a 'motive' to be untruthful" was permissible, even though "the natural implication of this

11

statement is that [the defendant] *did* have a motive to conceal the truth," because the "argument was fair and based on the evidence."

As Snyder acknowledges, this case depended on credibility determinations—which version of events did the jury find more credible. In that context, the prosecutor's comment that K.B. "could not" testify about her abuse with Snyder present is a reasonable inference from the evidence presented, including her age and her prior statements. Similarly, the other statements Snyder characterizes as impermissibly vouching for witness' credibility were merely requests that the jury consider the evidence before it "to determine the weight and credit to be given the testimony of each witness," as the district court had instructed it to do.

The comments of which Snyder complains did not fall outside the wide latitude afforded prosecutors in closing argument to fairly obtain a conviction. Thus, we do not need to consider the second step of the analysis about whether the alleged prosecutorial error affected the outcome of the trial. Snyder's claim of error on this point fails.

### DID THE DISTRICT COURT ERR BY DENYING SNYDER'S REQUEST TO USE DEMONSTRATIVE EXHIBITS DURING CLOSING ARGUMENT?

Next, Snyder claims the district court committed reversible error by denying his request to use demonstrative exhibits during closing argument. During the jury instruction conference, Snyder's counsel told the district court that he was "contemplating using a demonstrative aid at time of closing regarding the burden of proof." The record on appeal contains black-and-white copies of the proposed demonstrative aids identified as Defendant's Exhibit 2 and Defendant's Exhibit 3, which are set forth here in substantially similar form.

## BURDEN OF PROOF

**Guilty**

Guilt Beyond a Reasonable Doubt

Strong Belief

Guilt Likely

Probably Guilty

Possibly Guilty

Suspected

Perhaps

**Not Guilty**

May Not Be

Possibly Not

Unlikely

Probably Not

Less Than Unlikely

Highly Unlikely

Believed Not Guilty

## LEGAL BURDENS OF PROOF

| | |
|---|---|
| "<u>BEYOND</u>" REASONABLE DOUBT | <u>GUILTY</u> |
| "REASONABLE DOUBT"<br>*CRIMINAL TRIAL* | **<u>NOT GUILTY</u>** |
| "CLEAR AND CONVINCING"<br>*TERMINATE PARENTAL RIGHTS* | **<u>NOT GUILTY</u>** |
| "PREPONDERANCE"<br>*CIVIL TRIAL ($)* | **<u>NOT GUILTY</u>** |
| "PROBABLE CAUSE"<br>*SEARCH WARRANT – ARREST* | **<u>NOT GUILTY</u>** |
| "REASONABLE SUSPICION"<br>*TRAFFIC STOP* | **<u>NOT GUILTY</u>** |

The State objected, arguing that the Kansas Supreme Court disfavors quantifying the burden of proof through tools. The district court took the request under advisement. The next morning, before closing arguments, the district court denied Snyder's request, holding that the aids would not "be helpful to assist the trier of fact." The district court noted cases in which the Kansas Supreme Court "held that there's no definition or analogy that could make the [concept] of reasonable doubt any clearer than the words themselves" and that such efforts to define reasonable doubt usually only confuse jurors.

Snyder argues that this court should review the district court's denial of his request de novo because it violated his constitutional right to present a full and complete defense. See *State v. Macomber*, 309 Kan. 907, 921, 441 P.3d 479 (2019) ("An appellate court reviews de novo a claim that the trial judge interfered with the defendant's constitutional right to present a defense."). But Snyder did not make a constitutional argument to the district court. And parties may not raise constitutional claims for the first time on appeal

without asserting one of the recognized exceptions to the general rule that prohibits doing so. See *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Snyder neither acknowledges the failure to make a constitutional argument in district court nor asserts that an exception applies to allow him to make that argument for the first time on appeal.

Snyder also argues that this court should review de novo because he "argues the [district] court's decision was based on an error of law," citing *State v. Dukes*, 290 Kan. 485, 487, 231 P.3d 558 (2010). In *Dukes*, our Supreme Court held that Kansas appellate courts review de novo a challenge to the "legal basis" for a district court's decision. 290 Kan. at 487. Although Snyder repeatedly asserts that the district court made "an error of law," he does not specifically articulate what the alleged "error of law" was.

The State argues that we should review for abuse of discretion because a district court exercises discretion over the use of demonstrative exhibits. Our Supreme Court has held that the district court has the discretion to allow or disallow a demonstration for the jury, in light of the "'demonstration's propriety, probative value, and assistance to the trier of fact.'" *State v. Donesay*, 270 Kan. 720, 722, 19 P.3d 779 (2001). We agree with the State that we should review the district court's decision to deny the defendant's use of the demonstrative exhibits for an abuse of discretion. But even if we considered Snyder's claim that the district court's denial of his request violated his constitutional right to present a complete defense subject to de novo review, the result would be the same.

In the context of prosecutorial error, our Supreme Court has held that "[a]ny attempt to lower the burden of proof—*or even to define reasonable doubt*—is misconduct." (Emphasis added.) *State v. Holt*, 300 Kan. 985, 1004, 336 P.3d 312 (2014). "'Efforts to define reasonable doubt, other than as provided in [the applicable PIK instruction], usually lead to a hopeless thicket of redundant phrases and legalese, which tends to obfuscate rather than assist the jury in the discharge of its duty.'" *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 (2003).

In response to Snyder's claim about the demonstrative exhibits, the State points to a prior case before this court that is factually similar. In *State v. Avery*, No. 117,379, 2018 WL 1976440, at *2 (Kan. App.) (unpublished opinion), *rev. denied* 308 Kan. 1596 (2018), the district court prevented defense counsel from "draw[ing] a chart on the chalkboard for the jury showing a graduated scale of various burdens of proof:  'Guilt is highly unlikely; it's less than unlikely; probably not; possibly not; suspected; perhaps; probably guilty; strong belief; guilty beyond a reasonable doubt.'" 2018 WL 1976440, at *1. And like Snyder, Avery argued on appeal "that the district court violated his constitutional right to present his theory of defense by limiting defense counsel's closing argument regarding the State's burden of proof." 2018 WL 1976440, at *1. The *Avery* court held:

> "The jury here was instructed that the State was required to prove Avery's crimes beyond a reasonable doubt. Avery's theory of defense was that the State had not satisfied its burden of proof—proof beyond a reasonable doubt. . . . [A]lthough the court restricted defense counsel from using a chart to show a graduated scale of various burdens of proof, defense counsel was able to fully develop Avery's defense throughout trial and in its closing argument.
>
> "Avery was not deprived of a meaningful opportunity to present a complete defense simply because his attorney was precluded from showing the jury a chart that he believed represented the graduated scale of various burdens of proof. The district court never excluded any defense evidence and the limitation it did impose did not hinder Avery's presentation of evidence in any way. Instead, defense counsel was able to comprehensively argue that the State failed to meet its burden of proof based on a lack of evidence. Thus, the district court did not violate Avery's constitutional right to present his theory of defense.
>
> "Rather than restrict Avery's right to present a defense, the district court exercised its discretion by limiting defense counsel's closing argument—a decision that this court reviews only for an abuse of discretion. A judicial action constitutes an abuse of discretion if (1) no reasonable person would take the view adopted by the district court; (2) the action is based on an error of law; or (3) the action is based on an error of fact. [Citations omitted.]" 2018 WL 1976440, at *2.

16

After noting the cases in which our Supreme Court has disapproved trying to explain the phrase "reasonable doubt," the *Avery* panel concluded:

> "A reasonable person could decide that allowing defense counsel to draw a chart demonstrating the proposed graduated scale of burdens of proof would confuse the jury. No claim is made that the court's decision was based on an error of fact or law. Thus the trial court's ruling was not an abuse of discretion." 2018 WL 1976440, at *2.

Snyder does not address this court's decision in *Avery*, even in his reply brief. Like at Avery's trial, the district court instructed the jury at Snyder's trial that the State had the burden to prove Snyder guilty beyond a reasonable doubt. Snyder's theory of defense was that the State had not done so. During closing argument, defense counsel began by reiterating the jury's responsibility to hold the State to its burden of proof and counsel comprehensively argued that the State had not proven Snyder's guilt beyond a reasonable doubt. The district court's decision not to allow the proposed charts explaining reasonable doubt did not hinder this argument, nor did it restrict Snyder's ability to present evidence. As in *Avery*, the district court here did not impair Snyder's right to present a full defense, and it cannot be said that no reasonable person would agree with the decision not to allow the charts. We conclude the district court did not err by denying Snyder's request to use demonstrative exhibits during closing argument.

### WAS SNYDER DENIED A FAIR TRIAL BASED ON CUMULATIVE ERROR?

Snyder argues that the prosecutorial errors and the refusal to allow him to use demonstrative aids during closing argument cumulatively denied him a fair trial. But as we have concluded, the prosecutor committed no error during closing argument and the district court did not err by denying Snyder's request to use the demonstrative exhibits. And "when there is no error, there can be no errors to contribute to cumulative error and there is no basis for reversal." *State v. Barlett*, 308 Kan. 78, 91, 418 P.3d 1253 (2018).

WAS THERE SUFFICIENT EVIDENCE TO SUPPORT SNYDER'S KIDNAPPING CONVICTION?

Next, Snyder claims there was insufficient evidence to support his kidnapping conviction. The operative information charged that Snyder "unlawfully and feloniously [took] or confine[d] a person, to wit: [K.B.] (YOB: 2006), accomplished by force, threat or deception and with the intent to hold said person to facilitate the commission of any crime, to wit: aggravated indecent liberties." Snyder argues that there was insufficient evidence to support the claim that he took or confined K.B. by force. The State disagrees.

> "When a defendant challenges the sufficiency of the evidence supporting a conviction, we 'review[] the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' We will not 'reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Rucker*, 309 Kan. 1090, 1093, 441 P.3d 1053 (2019).

To review, the State's kidnapping charge against Snyder was based on the evidence that Snyder began fondling K.B. in the bedroom but then K.B. got up from the bed and went into the bathroom about 3 feet away and closed the door. Snyder then followed K.B. into the bathroom and when she tried to leave, Snyder grabbed her arm and pulled her back into the bathroom where he continued to touch K.B. inappropriately. The only evidence about Snyder grabbing K.B.'s arm and pulling her back into the bathroom was presented by the State through K.B.'s forensic interview with Marks.

Snyder argues that the statements in K.B.'s interview with Marks do not provide sufficient evidence of a taking or confinement to support a kidnapping conviction. He bases this argument on our Supreme Court's holding in *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976). In *Buggs*, the Kansas Supreme Court held:

18

"[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(a) Must not be slight, inconsequential and merely incidental to the other crime;

(b) Must not be of the kind inherent in the nature of the other crime; and

(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection.

"For example:  A standstill robbery on the street is not a kidnapping; the forced removal of the victim to a dark alley for robbery is. The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; the removal from a public place to a place of seclusion is. The forced direction of a store clerk to cross the store to open a cash register is not a kidnapping; locking him in a cooler to facilitate escape is. The list is not meant to be exhaustive, and may be subject to some qualification when actual cases arise; it nevertheless is illustrative of our holding." 219 Kan. at 216.

Snyder argues that any taking or confinement in the bathroom with K.B. was slight, inconsequential, and merely incidental to the crime of aggravated indecent liberties, so, under *Buggs*, it would not support a kidnapping. He asserts that grabbing K.B.'s arm did not lessen the chance that his crime would be discovered because the bathroom was only 3 feet away from the bedroom in which H.S. slept and they were the only three people in the house at the time. The State argues that "[k]eeping [K.B.] in the bathroom helped [Snyder] avoid detection of his illegal activities by other family members." The State also asserts that "[t]he bathroom door could be closed and locked," which would have helped prevent detection if Paternal Grandmother had come home.

The cases that the State cites in support of its argument are materially distinguishable from what happened here. In *Buggs*, a kidnapping conviction was affirmed where the victims "were accosted outside the Dairy Queen, at the fringe of the parking lot, where they were subject to public view . . . and the robbery could have been accomplished then and there," but the defendants forced the victims back inside the store,

19

which "substantially reduced the risk of detection not only of the robbery but of the rape." 219 Kan. at 216. In *State v. Chears*, 231 Kan. 161, 163-64, 643 P.2d 154 (1982), the defendant moved the victim from the living room to a bedroom to sodomize her, "ensur[ing] that there would be but one witness," because the defendant's cohorts, the victim's husband, and the victim's daughter remained in the living room, where they could neither see what was happening or attempt to interfere.

And in *State v. Richmond*, 250 Kan. 375, 378, 827 P.3d 743 (1992), the defendant moved the victim from "near the entrance to the home to a distant bedroom" to "lessen[] detection of the crime[s]" of burglary and rape, and he tied her up, which aided in facilitation of the burglary "by incapacitating her while he searched through her house and . . . remove[d] any items he desired to take." Importantly, in *Richmond*, the defendant's remarks to the victim showed that he "was concerned about the fact that the victim had seen his automobile [parked in front of her home] and also about whether any other person might be coming to the house." 250 Kan. at 378.

After the parties filed their briefs here, the Kansas Supreme Court decided *State v. Harris*, 310 Kan. 1026, 453 P.3d 1172 (2019). In that case, the defendant was convicted of kidnapping based on forcibly moving the victim from room to room within her apartment over a two-hour period, all while repeatedly demanding money. The defendant challenged his conviction, in part, by arguing that these movements did not satisfy the "taking or confinement" element of kidnapping that requires taking or confining to facilitate the commission of a crime or to facilitate flight. After setting forth the *Buggs* test, our Supreme Court first rejected the defendant's argument that the short distance he had removed the victim was merely incidental to his crimes. 310 Kan. at 1032, 453 P.3d at 1177. The court reiterated its prior holdings that there is no distance requirement for the "taking" element of kidnapping. 310 Kan. at 1032, 453 P.3d at 1177. The court also rejected the defendant's argument that the taking or confining was merely incidental to his other crimes, noting that the defendant forced the victim to move from room to room

20

over an extended period of time and that he expressed concern that she would run away. 310 Kan. at 1032, 453 P.3d at 1177-78. In fact, the defendant prevented the victim from getting dressed, commenting that she was less likely to run out of the house if she remained naked. 310 Kan. at 1033, 453 P.3d at 1178.

*Buggs*, *Chears*, *Richmond*, and *Harris* involve takings or confinements that substantially facilitated the crimes of commission. In each of these cases, the defendant moved the victim from one room to another over a long time period. On the other hand, Snyder's act of grabbing K.B.'s arm as she tried to escape the bathroom and dragging her back inside was "slight, inconsequential, and merely incidental to" his committing aggravated indecent liberties with a child. See *Buggs*, 219 Kan. at 216. Likewise, the act did not substantially lessen the risk of Snyder's detection or substantially facilitate his commission of the crime. See *Buggs*, 219 Kan. at 216.

We conclude the State did not present sufficient evidence of "taking or confining" to support Snyder's conviction of kidnapping. As a result, Snyder's conviction of kidnapping is reversed and we remand for the district court to vacate the sentence.

DID THE DISTRICT COURT ERR IN INSTRUCTING THE JURY ON KIDNAPPING?

Even though we are reversing Snyder's kidnapping conviction because of insufficient evidence to support the conviction, we will also address his claim that the district court erred in instructing the jury on kidnapping. The State charged Snyder with kidnapping by taking or confining K.B. with the intent to hold her to commit the specific crime of aggravated indecent liberties with a child. But at trial, the district court instructed the jury that to establish the charge of kidnapping, the State had to prove that (1) Snyder "took or confined [K.B.] by force"; (2) he did so "with the intent to hold [K.B.] to facilitate the commission of *any crime*"; and (3) he did so "on or between January 31, 2015 and November 25, 2015 in Saline County, Kansas." (Emphasis added.)

21

Snyder argues that the district court "violated [his] due process rights" by instructing the jury on a broader definition of kidnapping than was charged in the information. More specifically, Snyder argues that the district court erred because the State charged him with taking or confining K.B. with the intent to hold her to commit the specific crime of aggravated indecent liberties with a child, but the court instructed the jury that it could find Snyder guilty of kidnapping if he took or confined K.B. with the intent to hold her to facilitate the commission of *any crime*. He asserts that had the district court properly instructed the jury, it would have reached a different verdict on the kidnapping charge.

When reviewing a jury instruction challenge, "[w]e must first determine whether the alleged instruction error occurred, which requires us to consider if the instruction was legally and factually appropriate. In doing this, we exercise unlimited review." *State v. Garcia-Garcia*, 309 Kan. 801, 819, 441 P.3d 52 (2019). The State concedes that the jury instruction was erroneous. The jury instruction failed to limit the elements of kidnapping to what was charged in the information, and the Kansas Supreme Court has long instructed that "'[a] jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous.'" *State v. Brown*, 306 Kan. 1145, 1165, 401 P.3d 611 (2017) (quoting *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 [2009]).

Because there was error, this court must conduct a reversibility inquiry and, as the parties agree, Snyder's failure to object to the district court giving the instruction means that the clear error standard applies. See *Blansett*, 309 Kan. at 408; K.S.A. 2018 Supp. 22-3414(3). This court "determines whether it is firmly convinced that the jury would have reached a different verdict without the error, in which case reversal is required. Reversibility is subject to unlimited review and is based on the entire record." *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014). As the defendant, Snyder bears the burden to prove clear error. See 299 Kan. at 135.

Snyder points out that right after the district court gave the erroneous instruction, the court instructed the jury: "Evidence has been admitted tending to prove that the defendant committed bad acts with [K.B.] other than the crimes charged. Such evidence may only be considered as evidence of the relationship of the parties and motive." He argues that this instruction could have led the jury to rely on an uncharged "bad act" as constituting the "crime" that the kidnapping was intended to facilitate. For example, he contends that "[t]he jury could have relied on the 'bad act' of grabbing [K.B.] by the arm, which is arguably a battery," or "the 'bad act' of rubbing her vagina, and thought it was rape," and then used that finding to support the kidnapping conviction. Because of these possibilities, Snyder asserts that the jury would have reached a different result had the jury instruction been properly limited to acts intended to facilitate the commission of aggravated indecent liberties with a child.

The State disagrees, arguing that because the only crime related to K.B. other than kidnapping with which the State charged Snyder was aggravated indecent liberties with a child, the jury would have understood that the phrase "any crime" in the erroneous jury instruction meant aggravated indecent liberties with a child. A review of the record as a whole supports the State's argument.

In opening argument, the prosecutor summarized the charges against Snyder involving K.B. as

> "aggravated indecent liberties, the lewd fondling of his person in the bedroom; aggravated indecent liberties, the lewd fondling of [K.B.] in the bedroom; aggravated indecent liberties for touching her again in the bathroom; and kidnapping, for taking or confining her in that bathroom in order *so that he could fondle her*." (Emphasis added.)

In closing argument, the prosecutor addressed the other "bad acts" instruction:

23

"You've heard evidence of other bad acts with respect to [K.B.] . . . The first time that this really happened in the bed, they were napping, and he unbuttoned and unzipped her pants, and he was trying to get, but she made the excuse to go to the bathroom, went to the bathroom, shut the door and stayed there for ten minutes, until Grandma and Grandpa come home. *This may not be used to support a specific charge that is set forth for you.* You may consider this evidence solely for the purpose of establishing motive and relationship of the parties." (Emphasis added.)

Later in closing argument, the prosecutor discussed the kidnapping charge, telling the jury that it referred to the allegation "[t]hat he took or confined her by force, with [the] intent to hold her to facilitate the commission of a crime, *aggravated indecent liberties*." (Emphasis added.) At the end of the State's initial closing argument, the prosecutor said:

"I ask that you find him guilty of three counts of rape, of [H.S.]; aggravated indecent liberties in his bed of his daughter, [K.B.]; and an episode of aggravated indecent liberties in that bathroom, in taking or confining her, trying to keep her in there so he could do *that crime* to her, ultimately the kidnapping." (Emphasis added.)

The record contains nothing—other than the erroneous jury instruction—that suggested to the jury that anything but an intent to commit aggravated indecent liberties could support the kidnapping charge. Given the State's repeated explanation of the kidnapping charge as resting on an intent to commit aggravated indecent liberties, along with the explanation to the jury that it could not use the "other bad acts" to support kidnapping, we are not firmly convinced that the jury would have found Snyder not guilty of kidnapping had the proper instruction been given. Thus, the jury instruction alone, though erroneous, does not require reversal of Snyder's kidnapping conviction.

Next, Snyder claims his convictions of aggravated indecent liberties with K.B. were multiplicitous. Multiplicity is "'the charging of a single offense in several counts of a complaint or information.'" *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016). "'The principal danger of multiplicity is that it creates the potential for multiple punishments for a single offense, which is prohibited by the Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights.' [Citation omitted.]" 304 Kan. at 826.

Snyder was originally charged with three counts of aggravated indecent liberties with K.B. Snyder argued to the district court that the three charges were multiplicitous because they arose from the same conduct. The State conceded that Snyder had a point about two of the charges, and the district court ruled that those two charges should merge into one. After the merger, two charges of aggravated indecent liberties with K.B. remained:  one based on Snyder's alleged behavior in his bedroom, and one based on his alleged behavior in the bathroom. The district court held that these two charges were not multiplicitous because they were separate instances of conduct. By making the multiplicity argument in the district court, Snyder preserved it for appeal.

On appeal, Snyder renews his argument that his two convictions of aggravated indecent liberties with K.B. were multiplicitous because both charges arose from one course of conduct. The State disagrees, arguing that there was a sufficient break between Snyder touching K.B. in his bedroom and Snyder touching K.B. in the bathroom to justify charging two separate counts. "Questions involving multiplicity are questions of law subject to unlimited appellate review." *State v. Davis*, 306 Kan. 400, 419, 394 P.3d 817 (2017). When considering multiplicity issues,

> "'the overarching inquiry is whether the convictions are for the same offense. There are two components to this inquiry, both of which must be met for there to be a double jeopardy violation: (1) Do the convictions arise from the same conduct? and (2) By statutory definition are there two offenses or only one?' [Citation omitted.]" *State v. King*, 297 Kan. 955, 970, 305 P.3d 641 (2013).

If the answer to the first question—whether the convictions arose from the same conduct—is no, "multiplicity is inapplicable" and the analysis concludes. See *State v. Weber*, 297 Kan. 805, 809, 304 P.3d 1262 (2013). If the answer to the first question is yes, the court moves on to consider whether the unitary conduct was statutorily defined as one offense. See 297 Kan. at 809.

*Unitary Conduct*

This court considers multiple factors to determine whether the convictions arose from the same—or "unitary"—conduct:

> "'(1) whether the acts occur at or near the same time; (2) whether the acts occur at the same location; (3) whether there is a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there is a fresh impulse motivating some of the conduct.' [Citation omitted.]" *State v. Holman*, 295 Kan. 116, 148, 284 P.3d 251 (2012), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

It is undisputed that the acts in question occurred at or near the same time. During her forensic interview, K.B. told Marks that the time from laying down to take a nap to the end of the encounter in the bathroom was 30 minutes to an hour. Moreover, during K.B.'s trial testimony, defense counsel asked if Snyder "went in [to the bathroom] with you" and whether he "followed you in," and K.B. responded "[y]eah" to both questions. This shows that the acts in the bedroom and the acts in the bathroom were close in time.

The State argues that the acts did not occur in the same location because the second act "occurred in a different room." The State's point is too fine a parsing of the concept of the same location in multiplicity analysis. One act occurred in Snyder's bedroom and one act occurred in the bathroom, but both rooms were in the same home. At trial, a witness testified that the distance from Snyder's bedroom to the bathroom was 2 feet, 11 inches. This court recently held that two acts occurring in short order in the same home supports a finding that those acts occurred at the same location for purposes of determining whether the conduct was unitary. See *State v. Rodriguez-Manjivar*, No. 120,039, 2019 WL 5089751, at *4 (Kan. App. 2019) (unpublished opinion) ("The acts here most likely can be considered to have occurred in the same place. While each touching occurred in a different room, those rooms were in the same apartment."). Thus, the evidence presented here supports a finding that the acts occurred in the same location.

The remaining two factors are harder to resolve. The State argues that there was an intervening event—"a break between the touchings in the bedroom and in the bathroom." The State asserts that this "break" is showed by K.B. going to the bathroom and pulling up her pants and underwear. The State further argues that the "break" between acts "provided the defendant with an opportunity to reconsider his or her [*sic*] crime, and the acts were motivated by a fresh impulse."

But even if Snyder had to open the bathroom door and pull K.B.'s pants and underwear back down, this is not the sort of "intervening event" that by itself prohibits a finding of unitary conduct. The State analogizes this case to *State v. Sellers*, 292 Kan. 346, 253 P.3d 20 (2011), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). In that case, the defendant touched the minor victim's breast while they were lying with her mother on her mother's bed, then he "left the room to go check on the family's dog, which was making noise in another room." 292 Kan. at 349. He was out of the bedroom for 30 to 90 seconds. The defendant came back into the room, "checked to see if [the victim's] mother was asleep," lay back down on the bed, and

touched the victim's "pubic area." 292 Kan. at 349-50. The defendant "got off the bed again and walked over to [the victim's mother's] side of the bed to see if she was still asleep." 292 Kan. at 350. "He then walked to [the victim's] side of the bed and started to push [her] shirt up," and the victim woke her mother. 292 Kan. at 350.

Sellers argued on appeal that his convictions for (1) touching the victim's breast and (2) touching the victim's pubic area were multiplicitous. The Kansas Supreme Court held that "the acts occurred at or near the same time and in the same location." 292 Kan. at 358. So the Supreme Court turned to "whether the break to check on the dog in another room was sufficient to constitute an intervening event and whether Sellers formulated a fresh impulse to reoffend in the time between leaving the room and returning to the bed." 292 Kan. at 359. The *Sellers* court concluded:

> "[T]his case is a close call. The sequence of events is subject to the interpretation that Sellers checked on the dog, and, for that matter, on the continuing slumber of [the victim's] mother, to ensure that no noise impeded his overall plan to molest [the victim]. But he did leave the room for 30 to 90 seconds, breaking the chain of causality and giving him an opportunity to reconsider his felonious course of action. The district court judge ultimately determined that Sellers had to make a second conscious decision to touch [the victim] and, acknowledging the difficulty of this call, we agree. The conduct underlying [the two charges] was not unitary." 292 Kan. at 359-60.

The State argues that this case "is closer to *Sellers*" because K.B. left the bathroom, pulled up and fastened her pants, and shut the bathroom door before Snyder entered the bathroom. On the other hand, Snyder argues that the behavior in the bedroom and the bathroom "was one continuous act," that "occurred within mere minutes, in a small space, with the same two people, with touching as the acts."

Snyder's characterization of the events is more persuasive. Highly summarized, the evidence at trial showed that Snyder and K.B. were in his bedroom, lying on his bed,

28

when Snyder made K.B. touch his penis and he touched her vagina. K.B. said that she needed to go to the bathroom, so she got up off the bed, pulled up her underwear and pants, and walked out of the bedroom to the bathroom, which was across the hallway, less than 3 feet away. Before she could lock the door, Snyder entered the bathroom, pulled K.B.'s pants and underwear back down, and touched her vagina. There was no evidence that Snyder remained in the bedroom for any appreciable amount of time before following K.B. to the bathroom, nor is there any indication that he followed her to the bathroom because of a fresh impulse to molest her. Rather, the evidence suggests that he was continuing with his original impulse to molest K.B., which was only momentarily interrupted by K.B.'s leaving to go to the bathroom.

This is also a material distinction between this case and *Sellers*—the acts recognized by the *Sellers* court as breaking the chain of causality were acts by the defendant: he stopped molesting his victim so that he could leave the room to check on a dog and so he could walk around the bed to see if the other person in the room was asleep. Here, the original molestation halted because K.B. said she needed to go to the bathroom. Unlike in *Sellers*, there is no indication that the original impulse to molest K.B. ceased or that the molestation stopped because of the defendant's actions.

Snyder molested K.B. in the bathroom within a few minutes of molesting her in the bedroom and the two locations were in the same home, not far apart. Although K.B.'s journey to the bathroom and her pulling up her underwear and pants arguably could be characterized as an intervening event, there was no evidence that Snyder's molestation of K.B. in the bathroom was motivated by a fresh impulse. Under the evidence presented at trial, this was a unitary course of conduct. Thus, we must move to the second step of the multiplicity analysis, which involves determining the unit of prosecution under the statute that criminalizes aggravated indecent liberties with a child.

*Unit of Prosecution*

As for the second step, our Supreme Court has instructed:

"'If the double jeopardy issue arises because of convictions on multiple counts for violations of a single statute, the test is: How has the legislature defined the scope of conduct which will comprise one violation of the statute? Under this test, the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution.'" *Holman*, 295 Kan. at 148-49.

In *State v. Sprung*, 294 Kan. 300, 311, 277 P.3d 1100 (2012), the court held that the plain language of the statute on aggravated indecent liberties with a child—which remains unchanged today and under which the State charged Snyder—creates a single unit of prosecution when an offender fondles or touches a child and the child fondles or touches the offender. Compare 294 Kan. at 308 with K.S.A. 2018 Supp. 21-5506(b)(3). Thus, Snyder forcing K.B. to touch his penis and Snyder touching K.B.'s vagina comprise only one violation of the statute. Because those acts occurred during a unitary course of conduct, Snyder's two convictions of aggravated indecent liberties with K.B. were multiplicitous. As a result, we reverse one of Snyder's convictions of aggravated indecent liberties with K.B. and we remand for the district court to vacate the sentence. See *State v. Hood*, 297 Kan. 388, 396, 300 P.3d 1083 (2013) (finding theft convictions multiplicitous, reversing one conviction, and remanding for the district court to vacate the sentence).

DID THE DISTRICT COURT ERR BY ORDERING CONSECUTIVE SENTENCES?

Next, Snyder claims the district court erred by ordering consecutive sentences. After announcing the sentences imposed for each of Snyder's convictions, the district court ordered Snyder to serve the kidnapping sentence, one of the hard 25 rape sentences,

30

and one of the hard 25 aggravated indecent liberties with a child sentences consecutively, with the remaining sentences running concurrent. To explain its decision to run some of the sentences consecutive, the district court stated:

> "Noting, for the record, that the defendant was in a father fiduciary relationship as indicated by the State, as it relates to [H.S.], and was in the position of father to [K.B.]. The existence of that relationship does play a part, as does the particulars of the molestation, the duration, and the age of these particular children."

We have reversed Snyder's kidnapping conviction because of insufficient evidence and vacated his 59-month sentence for that crime, so whether the district court erred by ordering the kidnapping sentence to be consecutive is now moot. But Snyder still has a hard 25 sentence for one of his rape convictions and a hard 25 sentence for his one remaining conviction of aggravated indecent liberties with a child that the district court ordered to run consecutive.

Snyder argues that the district court erred by ordering two of his hard 25 sentences to run consecutive because (1) Snyder argues sufficient factors to warrant concurrent circumstances, such as his "intellectual functioning issues" and his low criminal history score; (2) the district court's stated reasons for ordering consecutive sentences were the same factors the State argued when asking for consecutive sentences; (3) neither Mother, K.B., or H.S. asked for Snyder to serve 50 years before the possibility of parole; and (4) his sentence, practically speaking, is a life sentence without parole.

> "A sentencing judge has discretion to impose concurrent or consecutive sentences in multiple conviction cases under K.S.A. 2018 Supp. 21-6819(b) (absent certain circumstances, the sentencing judge shall 'have discretion to impose concurrent or consecutive sentences in multiple conviction cases'). This statute does not list specific factors for consideration. Rather, it states the judge 'may consider the need to impose an overall sentence that is proportionate to the harm and culpability' associated with the

31

crimes. [Citations omitted.]" *State v. Darrah*, 309 Kan. 1222, 1227, 442 P.3d 1049 (2019).

A district court abuses its discretion when its action is: (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. 309 Kan. at 1227. As the party asserting that the district court abused its discretion, Snyder "bears the burden of establishing such abuse." See 309 Kan. at 1227.

Snyder does not allege an error of fact or law undermines the district court's sentencing decision. Put simply, Snyder asks this court to reweigh the information before the district court and make the independent decision that consecutive sentences were not warranted. But that is not this court's role. Rather, to conclude the district court abused its discretion by unreasonably ordering the sentences to run consecutive instead of concurrent, this court "would have to conclude that no reasonable person would have taken the [district] court's view." See 309 Kan. at 1227.

But as the district court noted, K.B. and H.S. were Snyder's children. At the time of the crimes against them, both victims were under 10 years old. In a victim impact statement at the sentencing hearing, Mother spoke at length about the lasting effects of Snyder's crimes on K.B. and H.S., including ongoing emotional issues for both children. Mother specifically asked that Snyder "never be allowed around children again." The fact that the two hard 25 sentences involve separate victims is justification to run the sentences consecutive. A reasonable person could have concluded that consecutive sentences as ordered by the district court were proportionate to the harm and culpability associated with Snyder's crimes.

Snyder's argument that the district court abused its discretion in imposing a sentence that leaves him ineligible for parole until he is 88 years old—is effectively speaking, a sentence of life without parole. But the fact that Snyder will be 88 years old

before being eligible for parole does not mean that the district court acted arbitrarily, fancifully, or unreasonably in imposing the sentence. Rather, the record reflects that the district court considered the evidence before it and imposed a sentence with which other reasonable people could agree. We conclude the district court did not abuse its discretion by ordering two of Snyder's hard 25 sentences to run consecutive.

DID THE DISTRICT COURT ERR BY ORDERING LIFETIME POSTRELEASE SUPERVISION?

In his final issue, Snyder claims the lifetime postrelease supervision component of his life sentences is illegal. The State agrees that this portion of Snyder's sentence is illegal and should be vacated. See *State v. Page*, 303 Kan. 548, 549, 363 P.3d 391 (2015) (vacating lifetime postrelease supervision component of off-grid sentence because "sentencing court has no authority to order lifetime postrelease supervision in conjunction with off-grid indeterminate life sentence"). Thus, we vacate the portion of Snyder's life sentences that imposed lifetime postrelease supervision.

Finally, although the issue has not been raised by either party, we note that the journal entry of judgment reflects that Snyder was convicted of three counts of raping H.S. even though the verdict forms reflect that the jury found Snyder guilty of two counts of raping H.S. and a lesser included offense of attempted rape. On remand, we order the district court to correct the journal entry of judgment so that it reflects that Snyder's conviction in Count 3 is of attempted rape. This correction will not affect Snyder's sentence. K.S.A. 2018 Supp. 21-6627(a)(1)(B) requires the hard 25 sentence for a conviction of rape when the victim is under 14 years of age and K.S.A. 2018 Supp. 21-6627(a)(1)(H) requires the hard 25 sentence for convictions of "an attempt . . . of an offense defined in subsection (a)(1)(A) through (a)(1)(G)."

CONCLUSION

In conclusion, we reverse Snyder's conviction of kidnapping because of insufficient evidence and we reverse one of his convictions of aggravated indecent liberties with a child as multiplicitous and we remand for the district court to vacate the sentences on those convictions. We also direct the district court to vacate the portion of Snyder's life sentences that imposed lifetime postrelease supervision. Finally, we direct the district court to correct the journal entry of judgment so that it reflects that Snyder's conviction in Count 3 is of attempted rape. At Snyder's original sentencing hearing, kidnapping was designated as his primary crime of conviction. But that fact will not affect Snyder's case because his four remaining convictions are all off-grid crimes.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.